Weston et al., Appellants, *v.* Reading Company.

Argued January 18, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Jerome J. Shestack*, with him *Bernard J. Smolens* and *Schnader, Harrison, Segal & Lewis*, for appellants.

*Ernest R. von Starck*, with him *John H. Lewis, Jr.*, and *Morgan, Lewis & Bockius*, for appellee.

*Fairfax Leary, Jr.*, with him *John F. Meigs, Miles H. Shore, Eugene F. Waye*, and *Saul, Ewing, Remick & Saul*, for appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

Protesting shareholders and directors of the Reading Company have attempted to enjoin the Baltimore & Ohio Railroad Company and the Chesapeake & Ohio Railway Company from voting their Reading shares and otherwise mismanaging the Reading Company. They also sought an accounting with respect to various intercorporate transactions between the B&O, C&O and Reading which assertedly resulted in loss or injury to the latter. The protestors were successfully halted by preliminary objections, and the validity of the trial court's dismissal of their complaint is now before our Court.

Two principal issues are presented in this appeal: whether the protesting shareholders possess standing under Rule 1506 of the Pennsylvania Rules of Civil Procedure to obtain relief for defendants' alleged violation of their corporate fiduciary duties and whether any or all of the subject matter of this equity action is more properly within the exclusive or primary jurisdiction of the Interstate Commerce Commission. We affirm the chancellor's decree dismissing the complaint.

## Background

The parties have stipulated some of the pertinent facts, and others are of public record. The relevant corporate structures are both important and complex. Pursuant to the Transportation Act of 1940, 54 Stat. 899, 49 U.S.C. §1 et seq., the C&O and the B&O presented a plan to the Interstate Commerce Commission whereby the C&O was to acquire capital stock control of the B&O. The proposed affiliation was determined by the Commission to be consistent with the public interest, *Chesapeake & Ohio Ry.—Control—Baltimore & Ohio R. R.*, 317 I.C.C. 261 (1962), and appropriate judicial tribunals have concluded that the Commission's

findings were supported by substantial evidence. See *Brotherhood of Maintenance of Way Employees v. United States*, 221 F. Supp. 19 (1963), aff'd, 375 U.S. 216, 84 S. Ct. 341 (1963) (per curiam). Thus, since 1963 the C&O has controlled the B&O.

The B&O has been a substantial stockholder of the Reading Company since 1902. As of December 7, 1904, the B&O owned 21.66% of Reading's outstanding shares. B&O's buying program continued, and by November 18, 1963, the B&O controlled 49.92% of Reading. Since 1965, B&O's proportional share of control has been reduced to 38.26%.

The instant litigation originated on May 24, 1965, with the filing of a complaint in equity in the Philadelphia Court of Common Pleas by seven Reading shareholders and directors naming the B&O, C&O, and Reading as defendants. The C&O filed preliminary objections asserting the court lacked proper jurisdiction in that the C&O owned no track or other real estate and operated no trains or other facilities within Pennsylvania.[1] The Reading demurred and also objected to the court's jurisdiction, contending, inter alia, that the ICC possessed primary jurisdiction over this litigation. The B&O challenged the specificity of the pleadings, asserted plaintiffs had no standing, and asked the complaint be dismissed because of laches.

Without passing on the other objections, the chancellor sustained Reading's and B&O's demurrers on January 17, 1967, because of a failure to sufficiently distinguish between a derivative and a representative cause of action.

An amended complaint was filed by two of the original plaintiffs and one new plaintiff (hereinafter termed "appellants") on August 21, 1967. In it, appellants contend they are bringing the action ". . . derivate-

---

[1] By agreement, these objections have been continued and remain outstanding.

ly [sic], in behalf of themselves and all other stockholders of Reading similarly situated." They allege that the C&O owns 10.71% of the Reading and that thus the C&O, through the B&O's 38.26% share of the stock, controls approximately 49% of Reading's outstanding voting shares. It is averred that the B&O and C&O have ". . . improperly and illegally maintained and exercised control of Reading." Appellants also stated that Reading owns 48.97% of the Central Railroad Company of New Jersey. They assert C&O owns 2.3% of Jersey Central, and through its control of Reading dominates the affairs of Jersey Central as well. Appellants claim that this pyramid and concentration of control has allegedly been employed by C&O and B&O to the disadvantage of Reading and Jersey Central. Nine specific transactions are listed being in furtherance of what amounted to a "plan or design" and an "improper conspiracy" of mismanagement on the part of B&O and C&O, the substance of which will be detailed below.

The Reading and the B&O renewed their preliminary objections, raising, inter alia, issues of jurisdiction, improper addition of a party, and lack of capacity to sue. A separate petition to dismiss was filed by the B&O asserting the ICC had primary jurisdiction over appellants' action.

On March 29, 1968, the chancellor wrote to the General Counsel of the ICC and requested an amicus brief concerning the Commission's view of its exclusive or primary jurisdiction over the issues in this litigation.[2] The Deputy General Counsel responded in a letter detailing the Commission's position.[3] Counsel for all litigants were then invited to submit their comments.

---

[2] This was done in accordance with the practice adopted in *J. M. Huber Corp. v. Denman*, 367 F. 2d 104 (5th Cir. 1966).

[3] The Commission's view accords substantially with that of the chancellor and the one we announce today.

Finally, on January 10, 1969, the chancellor sustained the preliminary objections concerning the primary jurisdiction of the Interstate Commerce Commission and appellant's standing to sue. Otherwise, the preliminary objections were not decided. The amended complaint was dismissed without prejudice to another complaint being filed in accordance with the chancellor's opinion issued that same day. Our review is limited to the chancellor's ruling, and we do not here consider the respective merits of the preliminary objections expressly left undecided.

## The Amended Complaint

As will become evident, there is little disagreement in this litigation concerning the applicable principles of law. Rather the dispute centers on the nature of the amended complaint. Appellants urge they are not attacking the legality of the acquisition of control of Reading by B&O and C&O but only the improper and unlawful manner in which the control is being exercised to Reading's disadvantage. The railroads counter that the gist of the amended complaint is the existence of a conspiracy to effectuate a merger of Reading and Jersey Central into the C&O and B&O system at depressed merger values—an issue purportedly within the primary jurisdiction of the ICC. Thus, prior to investigating either appellants' standing or the ICC's primary jurisdiction, we must examine the amended complaint in some detail.

The perimeters of the complaint have already been noted, and we now turn to the nine specific acts of mismanagement set forth in section 12 of the bill.

Paragraphs 12(a)-(d) recount four alleged incidences of improper control concerning Reading's interest in the Philadelphia Perishable Products Company, an enterprise which operated a warehouse and

terminal facilities for the handling of produce shipped to Philadelphia by rail. In 1931, the C&O and B&O purportedly caused Reading to enter into an agreement with the B&O concerning a division of expenses incurred in running Perishable Products whereby Reading shouldered more than its fair share of the costs. Then in 1953, appellees supposedly compelled Reading to grant an option to purchase 611,049 square feet of the Perishable Products terminal to a B&O subsidiary at a price that was assertedly one half of the terminal's fair market value. Next, in 1961 the C&O and B&O allegedly engineered a plan pursuant to which the Reading permitted the B&O to move its terminal agent's office force from Pier 24 in Philadelphia to the Perishable Products terminal where they obtained rent-free office space, even though rent-paying tenants were displaced. Finally, some time in 1963 the C&O and B&O supposedly caused Reading to transfer its interest in Perishable Products to the B&O for a "grossly inadequate consideration."

In paragraph 12(e) it is averred that the C&O and B&O effectuated the sale of a number of rehabilitated box cars by Reading Dispatch, Inc., a Reading Company subsidiary, to Railease, a C&O subsidiary, for inadequate consideration. The cars were then leased to B&O for a term of fifteen years.

The next paragraph in the complaint (12(f)) asserts that in June, 1964, appellees made Reading lease a number of used hopper cars to the B&O ". . . on terms and conditions which were arbitrarily arrived at rather than through arms length negotiations. . . ."

In 12(g) appellants complain that at some unspecified time the C&O and B&O wrongfully compelled Reading to lease a large amount of railroad equipment from the B&O at exorbitant rents even though Reading had no bona fide need for the equipment.

Paragraph 12(h) states that up until March 22, 1967, appellees brought about the negligent, wasteful, and improper management of Jersey Central in order to acquire that foundering railroad for "little or no consideration." It is also alleged that Jersey Central has had to file a petition for reorganization pursuant to section 77(b) of the Bankruptcy Act.

Finally, in paragraph 12(i) appellants claim that in July, 1967, appellees wrongfully caused Reading to reject a merger proposal tendered by the Pennsylvania and the New York Central Railroads even though the proposal was purportedly more favorable to Reading than the one propounded by the C&O and B&O system.

By reason of these acts of mismanagement, appellants demand that B&O and C&O be enjoined from voting their Reading shares, continuing the mismanagement of Reading, and misusing Reading's corporate assets. An accounting is also requested.

### Standing

The parties have stipulated that the earliest acquisition of shares by any of the appellants was on April 1, 1964.[4] The issue becomes whether appellants possess adequate standing to challenge the acts of mismanagement alleged in their amended complaint.

Appellants' principal hurdle is Rule 1506 of the Pennsylvania Rules of Civil Procedure.[5] A two-pronged

---

[4] The earliest date of acquisition by any of the plaintiffs on the original complaint is May 20, 1964.

[5] Rule 1506 provides:

"In an action to enforce a secondary right brought by one or more stockholders or members of a corporation or similar entity because the corporation or entity refuses or fails to enforce rights which could be asserted by it, the complaint shall set forth

"(1) that each plaintiff was a stockholder or owner of an interest in the corporation or other entity at the time of the trans-

argument was pressed before the chancellor. First, appellants urged that the Act of August 27, 1963, P. L. 1355, §1, 15 P.S. §1516A superseded the Rule.[6] Secondly it was contended that the 1963 Act did not apply to the instant litigation as the Act related only to actions against an officer or a director of a corporation.

The chancellor disagreed and ruled that the 1963 Act did not govern railroads, because the Act was part of the Business Corporation Law, which specifically does not apply to ". . . any corporation incorporated for the purpose of acting as a railroad as defined in the Public Utility Law." See Act of May 5, 1933, P. L. 364, Art. I, §4, as amended, 15 P.S. §1004B(2)(ii). Rule 1506 was thus deemed controlling.

Appellants now contend that regardless of the correctness of the chancellor's reasoning as to the applicability of Rule 1506, they have sufficiently satisfied the rule's requirements to enable them to maintain this equity action. They urge that compliance with the rule is to be found in the allegation of a continuing conspiracy. We disagree.

---

action of which he complains or that his stock or interest devolved upon him by operation of law from a person who was a stockholder or owner at that time, and

"(2) the efforts made to secure enforcement by the corporation or similar entity or the reason for not making any such efforts."

[6] The Act of August 27, 1963 reads in pertinent part: "A. In any suit brought to enforce a secondary right on the part of one or more shareholders against any officer, or director, or former officer or director of a corporation, domestic or foreign, because such corporation refuses to enforce rights which may properly be asserted by it, the plaintiff or plaintiffs must aver and it must be made to appear, that the plaintiff or each plaintiff was a shareholder or holder of a beneficial interest in such shares at the time of the transaction of which he complains, or that his shares or beneficial interest in such shares devolve upon him by operation of law from a person who was a shareholder or holder of a beneficial interest in such shares at such time: . . . ."

The Act of April 18, 1945, P. L. 253, No. 114, §1, 15 P.S. §432[7] began the process of bringing Pennsylvania into line with the federal practice.[8] The 1945 Act applied to derivative suits "against any officer, or director, or former officer or director of a corporation, domestic or foreign", and was duplicated in the Act of August 27, 1963, supra.

Appellants argued before the chancellor that since the present litigation was not against an officer or director, the statutes had no application here. However, they also maintained the 1963 Act superseded Rule 1506.

The chancellor properly ruled that if the 1945 Act was read to permit appellants to maintain the present litigation notwithstanding the issue of the timely acquisition of shares, it would be inconsistent with Rule 1506. Since the latter became effective in 1952, it supersedes the 1945 Act. See Act of June 21, 1937, P. L. 1982, No. 392, §1, as amended, 17 P.S. §61; *Schofield Discipline Case*, 362 Pa. 201, 66 A. 2d 675 (1949); *Lojeski v. Quirk*, 202 Pa. Superior Ct. 471, 198 A. 2d 410 (1964). As noted above appellants' contentions concerning the 1963 Act are equally unavailing, since the Act does not apply to railroads. Hence Rule 1506 clearly controls.

---

[7] The Act of April 18, 1945, reads in relevant part: "In any suit brought to enforce a secondary right on the part of one or more shareholders or members of a corporation organized on a mutual plan without capital stock against any officer, or director, or former officer or director of a corporation, domestic or foreign, because such corporation refuses to enforce rights which may properly be arrested [sic] by it, the plaintiff or plaintiffs must aver and it must be made to appear, that the plaintiff or each plaintiff was a stockholder or was a member of such corporation at the time of the transaction of which he complains. . . ." This act was repealed "as to business corporations" by the Act of August 27, 1963, supra.

[8] See note 9 infra.

The underlying rationale of Rule 1506 has been well summarized: "Ownership at the time of the transaction complained of is a safeguard against speculation in corporate causes of action and is designed to remove the incentive to champerty and maintenance. It also seems to be a sound and wholesome principle of equity, for it prevents persons who have not been harmed from receiving a windfall." Goodrich-Amram, Standard Pennsylvania Practice, §1506-4.

By its terms, the rule requires that each plaintiff be a shareholder at the time of the occurrence of the challenged transaction. The chancellor correctly ruled that paragraphs 12(a)-(e) failed to satisfy the rule, for appellant Walter E. Schoenfeld did not acquire his shares until September 24, 1964. Appellants attempt to surmount this difficulty by an allegation of a continuing conspiracy. There has been little comment by Pennsylvania courts on the subject. However, because of Rule 1503's close affinity with Rule 23.1 of the Federal Rules of Civil Procedure[9] and statutes of at

---

[9] Rule 23.1 provides in pertinent part:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or a member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. . . ."

Rule 23.1 was adopted in 1966. However, it is very similar to Rule 23(b) which was adopted with the original federal rules in 1938, and about which the Advisory Committee on Rules has observed:

"The rule has a long history. In Hawes v. Oakland, 1892, 104 U.S. 450, 26 L. Ed. 827, the Court held that a shareholder could not maintain such an action unless he owned shares at the time

least six other jurisdictions,[10] we feel justified in looking outside of our own reported cases for assistance.

The Federal rule has been generally rationalized as operating to prevent courts from being used to litigate purchased grievances and becoming parties to speculative suits against corporations. See e.g., *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 556, 69 S. Ct. 1221, 1230 (1949); *Bateson v. Magna Oil Corp.*, 414 F. 2d 128, 131 (5th Cir. 1969).

Actually, little improvement has been made on the well known opinion of Roscoe Pound in *Home Fire Ins. Co. v. Barber,* 67 Neb. 644, 93 N.W. 1024 (1903), decided when he was sitting as a commissioner with the Supreme Court of Nebraska:

"Sound reason and good authority sustain the rule that a purchaser of stock can not complain of the prior acts and management of a corporation. Hawes v. Oakland, 104 U.S. 450, 26 L. Ed. 827; Dimpfell v. Ohio & M. R. Co., 110 U.S. 209, 3 Sup. Ct. 573, 28 L. Ed 121; Taylor v. Holmes, 127 U.S. 489, 8 Sup. Ct. 1192, 32 L. Ed. 179; Southwest Natural Gas Co. v. Fayette Fuel-Gas Co., 145 Pa. 13, 23 Atl. 224. . . . In Alexander v. Searcy, supra, [81 Ga. 536, 8 S.E. 630 (1888)], the

---

of the transactions complained of, or unless they devolved on him by operation of law. . . .

"Following the decision in Hawes v. Oakland, and at the same term, the Court, to implement its decision, adopted former Equity Rule 94, which contained the same provision above quoted from rule 23 F. R. C. P. The provision in former Equity Rule 94 was later embodied in former Equity Rule 27, of which the present Rule 23 is substantially a copy." Notes of Advisory Committee on Rules following Rule 23.

[10] The jurisdictions are California, Delaware, Nevada, New York, New Jersey, and Wisconsin. However, the problem is not confined to states with statutes similar to Rule 1506. The policy of contemporaneous shareholder ownership in derivative actions has been judicially adopted. See e.g., *Duncan v. National Tea Company,* 14 Ill. App. 2d 280, 144 N.E. 2d 771 (1957).

court says: 'The weight of authority seems to be that a person who did not own stock at the time of the transactions complained of, can not complain or bring a suit to have them declared illegal.' In United Electric Securities Company v. Louisiana Electric Light Company, [68 F. 673 (1895)] it is said: 'As a general proposition, the purchaser of stock in a corporation is not allowed to attack the acts and management of the company prior to the acquisition of his stock; otherwise, we might have a case where stock duly represented in a corporation consented to and participated in bad management and waste and, after reaping the benefits from such transactions, could be easily passed into the hands of a subsequent purchaser, who could make his harvest by appearing and contesting the very acts and conduct which his vendor had consented to.' . . . [T]he present stockholders . . . by contesting these acts, which did not injure any of the present stockholders in the least, are recovering back a large part of the purchase price of stock which was admittedly worth all that they paid for it. Such cases illustrate forcibly the wisdom of confining complaints of this kind to those who were stockholders at the time or their successors by operation of law.

"The rule that a suit for mismanagement can not be maintained by one who was not a stockholder at the time . . . has its foundation in a sound and wholesome principle of equity, namely, that the rules worked out by chancellors in furtherance of right and justice shall not be used, because of their technical character, as rules, to reach inequitable or unjust results. . . . The right of the stockholder to sue exists because of special injury to him for which otherwise he is without redress. If his interest is trifling and the injury thereto of no consequence, he can not sue to compel righting of wrongs to the corporation. . . . Hence there

is obvious reason for holding that one who held no stock at the time of the mismanagement ought not to be allowed to sue unless the mismanagement or its effects continue and are injurious to him, or it affects him specially and peculiarly in some other manner. . . . Except in such cases, the purchaser ought to take things as he found them when he voluntarily acquired an interest. If he was defrauded in the purchase, he should sue the vendor. As to the corporation and its managers, so long as he is not injured in what he got when he purchased, and holds exactly what he got and in the condition in which he got it, there is no ground of complaint. . . ." Id. at 656-58, 93 N.W. at 1028-29 (citations omitted). See also *Capital Wine & Spirit Corp. v. Pokrass,* 277 App. Div. 184, 98 N.Y.S. 2d 291, aff'd, 302 N.Y. 734, 98 N.E. 2d 704 (1951); see generally Baker & Carey, Corporation 666-67 (3d ed. 1959).

Turning to appellants' allegation of continuing wrongs, we note that the charge is wholly unsupported in the complaint. We here adopt the test for continuing transactions enunciated by the Fifth Circuit Court of Appeals in *Palmer v. Morris,* 316 F. 2d 649 (5th Cir. 1963), where plaintiff alleged that pursuant to an earlier transaction the company was still paying out sums of money for allegedly nonbeneficial services and exorbitant rentals. It was there stated: "Each of the counts . . . sufficiently stated the facts and circumstances touching on the alleged illegality of the payments currently being made so that these counts could not be dismissed as dealing only with transactions that had completely occurred and been terminated prior to plaintiff's acquisition of his stock." Id. at 650. Accord, *Bateson v. Magna Oil Corporation,* supra; cf. *Hoover v. Allen,* 180 F. Supp. 263 (S.D.N.Y. 1960); see generally Prunty, Business Associations, 35 N.Y.U.L. Rev. 1467 (1960).

Upon examination of the amended complaint, we conclude that the transactions in paragraphs 12(a)-(e) "had completely occurred and been terminated" prior to appellants' acquisition of the stock. To main-tain a cause of action based upon a "continuing wrong", appellants must allege specific on-going wrongs as to factually alleged acts. Cf. *Lawson v. Baltimore Paint & Chemical Corp.*, 298 F. Supp. 373 (D. Md. 1969).[11]

---

[11] As was stated in *Weinstein v. Behn*, Misc. , 65 N.Y.S. 2d 536 (1946), aff'd, 272 App. Div. 1045, 75 N.Y.S. 2d 284 (1947) :

"By using the present tense plaintiff seeks to create the impression that there is some sort of continuing general wrong, and that if it be made to appear that the transactions complained of continue to the present day she at least would have a right to pursue the action in relation to wrongs committed after the date of the acquisition of the stock by her. The answer is twofold. In the first place these allegations are merely conclusory and must be disregarded. . . .

"In the second place, it is clear to this court that the quoted allegations refer back to the alleged original wrongs specified in some detail under other paragraphs of the complaint, all of which occurred some time before plaintiff obtained her stock. These acts may not by the specious device of employment of appropriate language be transformed into recurring wrongs for the purpose of over-riding . . . [the applicable statute]. They are not distinguishable from the original wrongs. . . ." Id. at , 65 N.Y.S. 2d at 540 (citations omitted).

Similarly, in *Newkirk v. W. J. Rainey, Inc.*, 31 Del. Ch. 433, 76 A. 2d 121 (1950) it was observed:

"Although a conspiracy culminating in the 1948 merger is alleged, the fact is the plaintiffs complain of and seek relief with respect to three specific transactions. They involve three stock purchases in the years 1944 and 1945. Those purchases in my opinion are the transactions in the sense in which the term 'transaction' is employed in Section 51A. I say this because they are the wrongful acts which plaintiffs want remedied and which are susceptible of being remedied in a legal tribunal. The allegation of a conspiracy cannot obscure the hard fact that the stock purchases are the wrongs which plaintiffs want rectified. Once it is decided, . . . that the stock purchases are the 'transactions' of which plaintiffs complain, it almost necessarily follows under the undisputed

Reading finally severed its more than thirty year connection with Perishable Products Company and the terminal in 1963, and the policies of Rule 1506 would be totally frustrated if 1964 shareholders were permitted to challenge transactions stretching back to 1931. Thus, appellants have no standing regarding the acts of mismanagement set forth in paragraphs 12 (a)-(d).[12]

Paragraph 12(e) concerning the sale of box cars by Reading to Railease is likewise a completed transaction. The continuing lease of the cars is between Railease and B&O, and appellants, as Reading shareholders, have no standing to question its propriety.

The hopper car transaction in 12(f) rests on a different footing. Here, Reading itself has allegedly made an improper lease to B&O. This, we believe, is a continuing wrong, and as such appellants possess standing under Rule 1506 to challenge the transaction. However, as will appear below, the issues embodied in this paragraph are more appropriately before the ICC.

With respect to the remaining paragraphs of the amended complaint, it is impossible to determine the

facts that such transactions were consummated prior to the date plaintiffs acquired their stock.

". . . Those wrongful acts cannot by the specious device of employing appropriate language be transferred into continuing wrongs. . . ." Id. at 437, 76 A. 2d at 123-24 (citation omitted).

[12] We have dealt with the question of standing because it afforded an opportunity to clarify the significance of Rule 1506 and the concept of "continuing wrongs". However, even were we to conclude that appellants did possess standing with regard to the issues concerning the Philadelphia Perishable Products Company, we would be obliged to take account of the recent proceeding of *Klinger v. Baltimore & Ohio Railroad Company*, 432 F. 2d 506 (2d Cir. 1970) where the issue of B&O's use of the terminal and its other relationships with Philadelphia Products was thoroughly and completely aired in a shareholders derivative suit. The complaint was dismissed, and it was concluded that Reading had suffered no damages.

applicability of Rule 1506 to paragraph 12(g) because no date is given. Appellants do collectively meet the requirements of the rule as to the acts of mismanagement set forth in paragraphs 12(h) and (i), but, similar to 12(f), consideration of the issue in these paragraphs by our Court is inappropriate at the present time.

To recapitulate, we conclude that appellants are without standing with regard to paragraphs 12(a) through (3) and paragraph 12(g) is too vague to enable us to ascertain Rule 1506's applicability. Appellants do possess standing as to the transactions alleged in paragraphs 12(f), (h), and (i).

### Primary Jurisdiction

We are in accord with the chancellor that the ICC possesses primary jurisdiction over the issue of the acquisition and exercise of control over Reading by the C&O—B&O system with respect to two of the issues[13] appellants are qualified to raise in the amended complaint.

The principles of the doctrine of primary jurisdiction are well settled. The United States Supreme Court ". . . recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge. . . . The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Trans-Atlantic*, 400 U.S. 62, 68, 91 S. Ct. 203, 208 (1970) (footnote and citations omitted). The doctrine ". . . requires judicial abstention in cases where protection of the integ-

---

[13] Paragraphs 12(f) and (i).

rity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *United States v. Philadelphia National Bank*, 374 U.S. 321, 353, 83 S. Ct. 1715, 1736 (1963). Such abstention is necessary to promote ". . . proper relationships between the courts and administrative agencies charged with particular regulatory duties. . . ." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S. Ct. 161, 165 (1956). Accord, *Whitney National Bank in Jefferson Parish v. Bank of New Orleans*, 379 U.S. 411, 85 S. Ct. 551 (1965) ; *Far East Conference v. United States*, 342 U.S. 570, 72 S. Ct. 492 (1952) ; cf. *Bessemer and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission*, 430 Pa. 339, 243 A. 2d 358 (1968). See generally 3 Davis, Administrative Law §§19.01-.07 (1958) ; Jaffe, Primary Jurisdiction, 77 Harv. L. Rev. 1037 (1964) ; Latta, Primary Jurisdiction in Regulated Industries and the Antitrust Laws, 30 U. of Cin. L. Rev. 261 (1961) ; Schwartz, Legal Restriction of Competition in the Regulated Industries; An Abdication of Judicial Responsibility, 67 Harv. L. Rev. 436 (1954).[14]

---

[14] Appellees make a double argument that the ICC possesses exclusive jurisdiction over the issues in this appeal and if that is not acceptable, at least the ICC possesses primary jurisdiction. Because we conclude that the Commission is imbued with primary jurisdiction, we need not and do not reach the issue of exclusive jurisdiction. It has been suggested that the distinction is somewhat ephemeral: "Primary jurisdiction situations arise when the original jurisdiction of a court is being invoked to decide the merits of a controversy; the facts, the law, the relief, and it is held that the jurisdiction of the court either to decide one of the relevant issues or to entertain the action at all has been superseded by agency jurisdiction. Primary Jurisdiction is *pro tanto* exclusive jurisdiction; insofar as the agency has jurisdiction it excludes the courts." Jaffe, Primary Jurisdiction, 77 Harv. L. Rev. 1037, 1037-38 (1964).

The doctrine is clearly applicable to the present litigation. The Interstate Commerce Commission has unquestionably embarked upon and is continuing: ". . . a vast reorganization of rail transportation implementing the congressional policy of encouraging consolidation of the Nation's railroads into a 'limited number of systems.' Section 407 of the Transportation Act of 1920, amending §5(4) of the Interstate Commerce Act, 41 Stat. 481 (1920). That policy has been with us, in one form or another, for more than 45 years. The original idea of the 1920 Act, that the ICC would formulate a national plan of consolidation, proved unworkable. It ran into heavy opposition from carriers and eventually had to be abandoned. The 1920 Act was replaced by the Transportation Act of 1940 . . . governed the Commission's examination of the present transactions. Under the 1940 Act, the initiation of the merger and consolidation proceedings is left to the carrier themselves, and the Commission possesses no power to compel carriers to merge. However, the congressional directive for a limited number of railroad systems has not been changed. The only change has been in the means of achieving that goal. . . ." *Penn-Central Merger and N & W Inclusion Cases,* 389 U.S. 486, 492, 88 S. Ct. 602, 605 (1968) (citation omitted).[15]

[15] For a thorough history of the changes in the means of achieving the goal of a limited number of railroad systems, see *St. Joe Paper Co. v. Atlantic Coast Line R. Co.,* 347 U.S. 298, 315-21, 74 S. Ct. 574, 584-87 (1954) (appendix).

Other recent proceedings before the Commission involving the implementation of the Congressional policy favoring the consolidation of railroads include: the proceeding approving the N & W—Nickel Plate—Wabash merger, *Norfolk & Western Ry. and New York, Chicago & St. Louis R. R.—Merger, etc.,* 324 I.C.C. 1 (1964), supplemented, 330 I.C.C. 780 (1966) and further considered, 331 I.C.C. 22 (1967); and the proceeding approving the merger of the Pennsylvania Railroad Company and the New York Central System,

The Commission has been endowed with extensive regulatory powers to enable it to further national transportation policy.[16] It is not our purpose to here review the history of the ICC.[17] If it sufficient to note that the Commission has exclusive authority over mergers, for it is unlawful for any person, except with Commission approval obtained in an appropriate proceeding,[18] to ". . . accomplish or effectuate, or to partici-

*Pennsylvania R. R.—Merger—New York Central R. R.*, 327 I.C.C. 475 (1966). See also *Penn Central Merger and N & W Inclusion Cases*, 389 U.S. 486, 88 S. Ct. 602 (1968).

Apparently three systems of railroads were being developed in the Eastern United States: the Penn Central, the C&O—B&O, and the N&W. The situation is in a state of flux at present, however, for the N&W and C&O have filed an application with the I.C.C. for the approval of a merger, and the Penn-Central is in the process of reorganization under Section 77 of the Bankruptcy Act.

[16] The National Transportation Policy has been defined by Congress as follows: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." Act of September 18, 1940, c. 722, Title I, §1, 54 Stat. 899, 49 U.S.C. note preceding §1. See also *Chicago & Eastern Illinois Railroad Co. v. United States*, 375 U.S. 150, 151, 84 S. Ct. 224 (1963); *Schaffer Transportation Co. v. United States*, 355 U.S. 83, 87-88 n. 5, 78 S. Ct. 173, 176 n. 5 (1957); *Interstate Commerce Commission v. Mehling*, 330 U.S. 567, 574-77, 67 S. Ct. 894, 879-99 (1947).

[17] See note 15, supra.

[18] A Section 5(2) proceeding.

pate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions." Act of February 4, 1887, c. 104, Pt. 1, §5, 24 Stat. 380, as amended, 49 U.S.C. §5(4) (hereinafter referred to as the Act).

The Commission has the power to initiate investigation in cases of effectuation of control by nonprescribed methods (Section 5(7) of the Act), and its authority in the area of mergers and consolidations ". . . shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power . . . to carry such transaction into effect and to own and operate any properties and *exercise any control or franchises acquired through said transaction. . . ."* Section 5(11) of the Act (emphasis added). Further, the ICC has the authority to make such appropriate supplemental orders as it may from time to time, for good cause shown, deem necessary. Section 5(9) of the Act.

Mindful of the Commission's extensive mantle of power and authority, we turn again to the amended complaint. The applicability of the doctrine of primary jurisdiction becomes readily apparent. In paragraph 12(i) of the complaint, the appellants challenge Reading's rejection of a proposed Penn-Central merger offer. Appellants also later seek a decree enjoining the C&O and B&O from voting their respective Reading

shares. In effect, such a decree would divest the C&O-B&O system of its Reading control and transfer the control to appellants or other shareholders. This judicial tampering with interlocking railroad systems would be wholly inappropriate at this juncture.

Appellants urge that the ICC has never "approved" of the C&O and B&O's acquisition of de facto control over Reading. While appellants may be technically correct, for there has been no separate hearing on the issue, B&O's holdings in Reading have always been a matter of public record. See e.g., *Penn-Central Merger and N & W Inclusion Cases*, supra at 519, 88 S. Ct. at 619. When the ICC approved C&O's acquisition of the B&O, see *Chesapeake & Ohio Ry.—Control—Baltimore & Ohio R. R.*, supra, the C&O-B&O system's dominance over Reading and Jersey Central received implied agency authorization.

Furthermore, the issue is presently pending before the Commission. The C&O-B&O system filed for an order approving control of the Western Maryland Railroad Co. The acquisition was initially approved, see *Chesapeake & Ohio Ry. and the Baltimore and Ohio R. R.—Control—Western Maryland Ry.*, 328 ICC 684 (1967), but the order is presently under reconsideration at Finance Docket 23178. Two petitions are pending in that litigation: one by the Reading Company for inclusion on fair and equitable terms within the C&O-B&O system, and one by the reorganization trustees of Jersey Central requesting a similar assimilation. Appellants have also interjected themselves into the joint application for merger by the Norfolk and Western and the C&O at Finance Docket 23832, raising the same allegations as contained in paragraphs 12(a), (e), (f), and (g) of the amended complaint.[19] Our Court should not interrupt these proceedings.

---

[19] See note 15, supra.

Appellants repeatedly stress that they are contesting only appellees' exercise of control over Reading rather than the acquisition of control. Their injunction request belies such protestations. Additionally, even appellees' exercise of its Reading control is a matter more appropriate for the Commission. See e.g., *Hewitt-Robins v. Eastern Freight-Ways, Inc.*, 371 U.S. 84, 83 S. Ct. 157 (1962). Thus, we may not consider paragraph 12(i) of the amended complaint.

Paragraph 12(f) concerning the leasing of hopper cars by Reading to the B&O meets a similar fate. Section 1(14) of the Interstate Commerce Act provides: "(a) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices." Considering the pendency of the general control issues before the ICC and its ability to afford relief on the hopper car transaction, we must again abstain.

As to paragraph 12(g), we have already indicated that it lacks adequate clarity to enable us to determine the applicability of Rule 1506. Even were the paragraph sufficiently specific so as to give appellants standing, we would refrain from passing on the issues raised therein because of the above quoted Section 1 (14) of the Act.

Finally, with respect to paragraph 12(h) and the alleged irregularities regarding the Jersey Central, the matter is presently pending before the United States

District Court for the District of New Jersey. A reorganization proceeding was instituted in that court on March 22, 1967, by Jersey Central pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C. §205. On March 25, 1968, the following order was entered:

"Pursuant to Section 77(c)(9) of the Bankruptcy Act the Trustees are hereby directed to report to the Court any facts pertaining to irregularities, fraud, misconduct or mismanagement as a consequence of which the Debtor [Jersey Central] may have a cause of action arising therefrom against any person or corporation.

"It is further requested that the Interstate Commerce Commission or such of its agencies as it may designate, report to the Court any facts pertaining to irregularities, fraud, misconduct or mismanagement as a consequence of which the Debtor may have a cause of action arising therefrom against any person or corporation." In the Matter of the Central Railroad Company of New Jersey, Debtor No. B-401-67, Order No. 116.[20]

We are confident that the bankruptcy court is giving full consideration to all aspects of the proceedings, and various interested parties have not hesitated to test that court's ruling on appeal. See e.g., *In re Central Railroad Company of New Jersey*, 429 F. 2d 507 (3d Cir. 1970), cert. denied sub nom. *Bondholders Protective Committee v. The 3¼% Mortgage Bondholders Protective Committee*, 401 U.S. 938, 91 S. Ct. 931 (1971) (application of Bondholders Protective Committee to intervene denied); *In re Central Railroad Company of*

---

[20] Regarding Order No. 116, on October 31, 1969, the Secretary of the Commission filed a letter with the clerk of the district court advising the court that as of that date the Commission ". . . has no information pertaining to irregularities, fraud, misconduct, or mismanagement, as a consequence of which the Debtor may have a cause of action arising therefrom against any person or corporation."

*New Jersey,* 411 F. 2d 1178 (3d Cir. 1969) (trustee authorized to appoint officer of B&O as chief operating officer of Jersey Central, and Court of Appeals would not review I.C.C. order) ; *In re Central Railroad Company of New Jersey,* 391 F. 2d 417 (3d Cir. 1968) (intervention of Lehigh Valley Railroad Co. allowed). We therefore will not entertain the issues raised in paragraph 12(h).

To summarize, appellants do not possess standing to raise issues presented in paragraphs 12(a)-(e). With respect to paragraphs 12(f) and 12(i), we defer to the primary jurisdiction of the Interstate Commerce Commission. Paragraph 12(g) is too vague for us to consider, and even were we to conclude it possessed sufficient clarity, the issue raised would be more properly one for the Commission. Finally, the matter raised in paragraph 12(h) is pending before the Federal District Court of New Jersey. We have considered all other portions of the complaint and conclude it must be dismissed.

Accordingly, the decree of the Court of Common Pleas of Philadelphia dismissing the amended complaint is affirmed.[21]. Costs on appellants.

Mr. Justice JONES concurs in the result.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

---

[21] It should be emphasized we are affirming the chancellor's decree. Thus, to the extent certain preliminary objections were undecided, they remain undecided, and those that were left outstanding, remain outstanding. (E.g., the C&O preliminary objections.)