DRAFTO CORPORATION, Appellant,

v.

NATIONAL FUEL GAS DISTRI-
BUTION CORPORATION,
Appellee.

Superior Court of Pennsylvania.

Submitted May 6, 2002.

Filed July 25, 2002.

Reargument Denied Sept. 26, 2002.

Anthony Cillo, Pittsburgh, for appellant.

Christopher M. Trejchel, Erie, for appellee.

Before JOYCE, ORIE MELVIN and POPOVICH, JJ.

POPOVICH, J.

¶ 1 Appellant Drafto Corporation appeals the order entered on November 20, 2001, in the Court of Common Pleas of Crawford County, sustaining a preliminary objection based on subject matter jurisdiction made by Appellee National Fuel Gas Distribution Corporation.

¶ 2 Our standard of review is as follows:

"When determining whether a trial court correctly decided the issue of subject matter jurisdiction, this Court will accept as true all facts averred in the complaint." *Fetterman v. Green*, 455 Pa.Super. 639, 689 A.2d 289, 291 (1997), *appeal denied*, 548 Pa. 648, 695 A.2d 786 (1997).

When a party raises preliminary objections challenging subject matter jurisdiction, the trial court's function is to determine whether the law will bar recovery because of the lack of such jurisdiction. The action or inaction of the parties cannot bestow subject matter jurisdiction upon a court that otherwise lacks it. . . .

Jurisdiction is the capacity to pronounce a judgment of the law on an issue brought before the court through

due process of law. It is the right to adjudicate concerning the subject matter in a given case.... Without such jurisdiction, there is no authority to give judgment and one so entered is without force or effect. The trial court has jurisdiction if it is competent to hear or determine controversies of the general nature of the matter involved *sub judice.* Jurisdiction lies if the court had power to enter upon the inquiry, not whether it might ultimately decide that it could not give relief in the particular case.

*Bernhard v. Bernhard,* 447 Pa.Super. 118, 668 A.2d 546, 548 (1995) (internal citations and quotation marks omitted).

*Aronson v. Sprint Spectrum,* 767 A.2d 564, 568 (Pa.Super.2001).

¶ 3 Viewed under the above referenced standard, the facts of this case are as follows: Drafto is a manufacturing company located in Cochranton, Pennsylvania. Drafto employs 39 persons in the Cochranton manufacturing facility that produces material-handling equipment for customers engaged in the steel production business. Drafto uses natural gas at its production facility and was supplied natural gas by National Fuel Gas Distribution Company (NFGD), a wholly-owned subsidiary of National Fuel Gas Company. National Fuel Gas Company and its wholly-owned subsidiaries are New Jersey corporations with their principal places of business in Buffalo, New York.

¶ 4 Drafto entered into a purchase agreement with National Fuel Resources (NFR), another wholly-owned subsidiary of National Fuel Gas Company, on or about June 5, 1997. Pursuant to the original purchase agreement, NFR agreed to supply natural gas to NFGD at a price of $3.45 per milliliter per cubic foot (mcf), which was then transported to Drafto pursuant to a second agreement between NFGD and Drafto. The original purchase agreement was for one year, which was to continue on a year-to-year basis unless either party utilized the 60–day cancellation clause. The parties extended the purchase agreement for one year on June 8, 1998, adjusting the price of the gas to $3.39 per mcf. Approximately one year later on June 7, 1999, the parties extended the agreement for one year, adjusting the price of the gas to $3.265.

¶ 5 On December 22, 1998, following the first extension of the purchase agreement, NFGD adjusted the meter index on meter # 6043168 located on Drafto's premises. Prior to December 22nd, the meter index measured gas usage in centiliters per cubic foot (ccf). After the adjustment, the meter measured gas usage in mcf. However, NFGD failed to change its billing system to reflect the adjustments to the meter on Drafto's property. As a result, NFGD billed Drafto only 10% of its true gas consumption for meter # 6043168 from December 22, 1998, until May, 2000. Drafto contends that it was not made aware of the error until August, 2000. NFGD made several attempts to recoup its loss, and on October 2, 2000, wrote to Drafto stating its intent to bill Drafto in excess of $21,800 for the gas used during the 16–month period. Drafto refused to pay the bill, arguing that it did not use as much gas as NFGD claimed and that the bill from NFGD was incorrectly calculated because the billing was based on gas prices higher than the contract price in effect between the parties.

¶ 6 On April 2, 2001, NFGD provided Drafto with a "48 hour shut off notice." NFR threatened to terminate Drafto's gas service on April 4, 2001 unless Drafto paid NFGD $21,387.24. Drafto then proceeded to file an informal complaint against NFGD with the Pennsylvania Public Utility Commission (PUC) to automatically stay NFGD's attempt to terminate Draf-

to's gas service. The PUC did not hold a hearing on the matter and was unable to aid the parties to reach a settlement. In a letter dated May 17, 2001, the PUC advised Drafto that failure to pay for the gas that was not billed during the 16–month period would result in termination of its gas service. The PUC also warned Drafto that if it chose to file a formal complaint, the filing of the complaint would not automatically prohibit termination of its gas service if it failed to pay for the gas service that was not billed during the 16–month period.

¶ 7 After the PUC failed to mediate a settlement between the parties, Drafto filed a complaint in equity against NFGD in the Court of Common Pleas of Crawford County on June 21, 2000, seeking an injunction to prevent NFGD from terminating its gas services, compensatory damages and punitive damages. On July 11, 2000, NFGD filed preliminary objections to Drafto's Complaint, raising, *inter alia,* lack of subject matter jurisdiction. NFGD argued that the trial court lacked subject matter jurisdiction over this action because primary jurisdiction over the action rested with the PUC. On November 20, 2001, without a hearing, the trial court sustained NFGD's preliminary objection with respect to lack of subject matter jurisdiction, and deferred all issues to the PUC, with the exception of damages. The trial court took no action on the remainder of NFGD's preliminary objections. Drafto brought timely appeal to this Court from the grant of the preliminary objection on December 19, 2001.

¶ 8 Drafto presents only one question for our review: Whether the trial court erred when it found this action raises complex issues within the primary jurisdiction of the PUC that required it to bifurcate this action and refer the substantive issues to the PUC. Drafto argues that

there are no complex issues in this action that require the special expertise of the PUC. We agree.

¶ 9 The doctrine of primary jurisdiction was first espoused by this Commonwealth in *Weston v. Reading Co.,* 445 Pa. 182, 282 A.2d 714 (1971). Our Supreme Court defined "primary jurisdiction" as follows:

> The doctrine "... requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963). Such abstention is necessary to promote "... proper relationships between the courts and administrative agencies charged with particular regulatory duties...." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

*Weston,* 282 A.2d at 723.

¶ 10 The trial court, in its memorandum and order of November 20, 2001, granting NFGD's preliminary objection, relies on the decision of our Supreme Court in *Elkin v. Bell Telephone Company of Pennsylvania,* 491 Pa. 123, 420 A.2d 371 (1980). Writing for a divided Court, Mr. Justice Larsen characterized the doctrine of "primary jurisdiction" as follows:

> It is equally important to realize what the doctrine is not—it is not simply a polite gesture of deference to the agency seeking an advisory opinion wherein the court is free to ignore the agency's determination. Rather, once the court properly refers a matter or a specific issue to the agency, that agency's determination is binding upon the court and the parties (subject, of course, to appellate review through normal channels), and is not subject to collateral attack in the pending court proceeding. "The

common law doctrine of res judicata, including the subsidiary doctrine of collateral estoppel, is designed to prevent the relitigation by the same parties of the same claim or issues." K.C. Davis, *Administrative Law*, § 18.10 (1972). Once the administrative tribunal has determined the issues within its jurisdiction, then the temporarily suspended civil litigation may continue, guided in scope and direction by the nature and outcome of the agency determination. *Feingold v. Bell of Pennsylvania, supra*, 477 Pa. at 22, 383 A.2d at 801 (Pomeroy, J., dissenting).

*Elkin*, 420 A.2d at 376–377.

¶ 11 Mr. Justice Larsen continued, stating:

We must enter a caveat, however, Courts should not be too hasty in referring a matter to an agency, or to develop a "dependence" on the agencies whenever a controversy remotely involves some issue falling arguably within the domain of the agency's "expertise." "Expertise" is no talisman dissolving a court's jurisdiction. *Accommodation* of the judicial and administrative functions *does not mean abdication* of judicial responsibility. The figure of the so-called "expert" looms ominously over our society—too much so to permit the roles of the court and jury to be readily relinquished absent a true fostering of the purposes of the doctrine of primary jurisdiction.

Therefore, where the subject matter is within an agency's jurisdiction *and* where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter to the appropriate agency. Also weighing in the consideration should be the need for uniformity and consistency in agency policy and the legislative intent. **Where, on the other hand, the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility. In such cases, it would be wasteful to employ the bifurcated procedure of referral, as no appreciable benefits would be forthcoming.**

*Elkin*, 420 A.2d at 377 (footnotes omitted) (emphasis added).

¶ 12 In its decision to grant NFGD's Preliminary Objection for lack of subject matter jurisdiction, the trial court held that the root of the issues in this case revolved around NFGD's administrative practices pertaining to billing. The trial court found that NFGD's administrative billing practices constituted a "service" for purposes of § 102 and § 1501 of the Public Utility Code, and, therefore, all issues pertaining to that service should be deferred to the PUC. *See* 66 Pa.C.S.A. §§ 102, 1501.[1] The trial court relied on the deci-

---

1.  66 Pa.C.S.A. § 102 defines "service" in the following manner:

    "Service." Used in its broadest and most inclusive sense, includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this part to their patrons, employees, other public utilities, and the

    public, as well as the interchange of facilities between two or more of them . . .
    66  Pa.C.S.A. § 1501 states:
    Character of service and facilities.
    Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the

sion of the Commonwealth Court in *Aronson v. Pennsylvania Public Utility Commission*, 740 A.2d 1208, 1209 (Pa.Cmwlth. 1999), which held that billing statements from a gas company constituted "adequate and reasonable services under Section 1501 of the Public Utility Code."

¶ 13 We agree with the Commonwealth Court's holding in *Aronson*. It is clear that the administrative billing practices of a public utility company are encapsulated within the definition of "service" in 66 Pa.C.S.A. § 1501. In this case, we are presented with a much different issue, *i.e.*, whether the trial court *should* have deferred the substantive issues in this case to the PUC, or was it able to decide the case without the PUC's assistance. We were faced with a similar issue in *Ostrov v. I.F.T., Inc.* 402 Pa.Super. 87, 586 A.2d 409 (1991). In *Ostrov*, Ostrov became a participant in a self-insurance plan offered by I.F.T., Inc (I.F.T.). I.F.T. was a corporation organized by a number of Philadelphia area taxicab operators to administer a PUC-approved self-insurance plan for cab operators. *Ostrov*, 586 A.2d at 412. As part of the insurance plan, the PUC was empowered to suspend the participant certificate holders' self-insured status and suspend their operating rights if it was shown that unqualified drivers were driving, leasing or possessing a taxicab operated by a participant certificate holder. *Id.*, 586 A.2d at 411. After Ostrov became a participant in the plan, he became injured in an auto accident while driving his cab. After he gave timely notice of the injury and accident to I.F.T., I.F.T. requested that Ostrov submit to the post-accident medical examination required by the terms of the plan. *Id.*, 586 A.2d at 412. Ostrov refused to be examined despite warnings from I.F.T. that he could be decertified and denied coverage if he did not submit to the exam. Ostrov still refused to submit to the exam, and I.F.T. notified him that he was decertified as an approved driver, that no insurance benefits would be paid by the plan, that he was prohibited from operating a cab under that plan and that his company would be ejected from the plan and fined if he continued to operate a cab despite his decertification. *Id.*, 586 A.2d at 412.

¶ 14 After his decertification notice, Ostrov filed a petition for a preliminary injunction and a two count complaint against I.F.T. Ostrov argued that the medical examination requirement of the plan violated the Pennsylvania Motor Vehicle Financial Responsibility Law. In the equity count of the complaint, Ostrov sought an award of compensatory and punitive damages and a permanent injunction against I.F.T. *Ostrov*, 586 A.2d at 412. I.F.T. filed preliminary injunctions arguing, *inter alia*, that Ostrov had failed to exhaust his administrative remedies by failing to petition the PUC for relief and that the trial court lacked jurisdiction to decide the case. The trial court granted the preliminary objection as to lack of subject matter jurisdic-

public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission. Subject to the provisions of this part and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service. Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility. The commission shall have sole and exclusive jurisdiction to promulgate rules and regulations for the allocation of natural or artificial gas supply by a public utility.

tion and dismissed Count I (equity). *Id.,* 586 A.2d at 413. Ostrov appealed to this Court, arguing that the trial court erred by finding that it lacked subject matter jurisdiction to hear the case. We agreed, holding that the trial court confused the doctrines of primary jurisdiction and subject matter jurisdiction. We held that the doctrine of primary jurisdiction does not operate to oust the subject matter jurisdiction of the court. *Id.,* 586 A.2d at 413. Rather, our Supreme Court's holding in *Elkin v. Bell Telephone of Pennsylvania,* 420 A.2d at 377, established the following:

> ... if the issue [in question] is within the [PUC's] jurisdiction and is a complex matter requiring special competence, it should be referred to the [PUC]. However, as the *Elkin* court also cautioned, a court should not be too hasty in referring a matter to an agency when the court is equally capable of resolving it. *Elkin,* 491 Pa. at 134, 420 A.2d at 377.

*Ostrov,* 586 A.2d at 414.

¶ 15 Accordingly, we found that where the issues of the case involve matters regarding service provided to a *particular* litigant are for the courts to resolve, as opposed to matters involving the service the utility owed to the general public, which are for the PUC. *Ostrov,* 586 A.2d at 415. Applying the aforementioned principles, we found that the nature of Ostrov's claim was such that it was a specific and limited challenge to his decertification. *Id.,* 586 A.2d at 415. As such, it required careful construction of the precise language of the Pennsylvania Motor Vehicle Responsibility Law regarding medical examinations of claimants for benefits. We held that type of statutory construction and analysis were well within the purview of the courts and not within the areas of the PUC's expertise so as to justify deferring the issue to it. *Id.,* 586 A.2d at 415. Therefore, we found that the trial court erred when it deferred the issues to the PUC. *Id.,* 586 A.2d at 416.

¶ 16 When we view the present case in the light of *Ostrov,* it becomes clear that Drafto's specific challenge to NFGD's attempted termination of its gas service does not raise a complex issue that requires deferment to the PUC. As was the case in *Ostrov,* Drafto makes no challenge to any PUC rule or regulation, nor does it seek to provide a remedy the courts cannot give. In the present case, the trial court was asked by Drafto to issue an injunction to prevent NFGD from discontinuing Drafto's gas service. Drafto argued that the discontinuation of its gas service would ruin its business and that the injunction was proper to issue because Drafto had other equitable defenses to paying the amount billed by NFGD that resulted from its failure to adjust its billing procedures. Drafto had defenses that it could raise against NFGD regarding the collection of the underbilled funds. The core issue presented to the trial court was, in essence, a collection matter. This type of determination does not require the special expertise of the PUC, for it is well within the purview of the courts to issue injunctions and entertain challenges to contractual obligations. This is especially true since Drafto does not present a challenge to the court with respect to the gas service offered to the general public by NFGD, but instead challenges the failure of NFGD to properly bill Drafto after the adjustment of the meter conflicted with Drafto's purchase agreement. Accordingly, we reverse the court's order and remand this matter for disposition by the trial court in accordance with this opinion.

¶ 17 Order reversed. Case remanded with instructions. Jurisdiction relinquished.