IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sunrise Energy, LLC                  :
                                     :
            v.                       :   No. 1282 C.D. 2015
                                     :   Argued: June 8, 2016
FirstEnergy Corp. and West Penn      :
Power Company,                       :
                  Appellants         :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


OPINION
BY PRESIDENT JUDGE LEAVITT                    FILED:  October 14, 2016

            FirstEnergy Corporation and West Penn Power[1] (collectively, West
Penn) appeal an order of the Washington County Court of Common Pleas (trial
court) overruling their preliminary objections to a complaint filed by Sunrise
Energy, LLC (Sunrise Energy).  Sunrise Energy, *inter alia*, seeks declaratory relief
and damages for breach of contract.  West Penn filed a motion to dismiss asserting
that the matter should be transferred to the Pennsylvania Public Utility
Commission (PUC) because the dispute requires the construction of the Alternative
Energy Portfolio Standards Act (Alternative Energy Act).[2]  The trial court
concluded, however, that a court of common pleas was competent to construe the
terms of the Alternative Energy Act.  Because the legislature did not authorize the

---

[1] West Penn Power is a wholly owned subsidiary of FirstEnergy Corporation.

[2] Act of November 30, 2004, P.L. 1672, 73 P.S. §§1648.1 – 1648.8.

PUC, or any other state agency with responsibilities in the area of alternative energy, to adjudicate a dispute arising from the Alternative Energy Act, we affirm the order of the trial court.

## Background

Sunrise Energy operates a 950 kilowatt solar power facility in Washington County, Pennsylvania; West Penn is an electric distribution company.[3] Amended Complaint, ¶8. On October 21, 2010, Sunrise Energy and West Penn entered into an "Electric Service Agreement" that designated Sunrise Energy as the "customer." Amended Complaint, Exhibit 2; Reproduced Record (R.R.__) at 27a-29a. In accordance with this contract, West Penn agreed to purchase the excess electricity generated by Sunrise Energy. Amended Complaint, Exhibit 6; R.R. 40a. Sunrise Energy measures the electricity it generates and the electricity it consumes through the use of a bidirectional electricity meter. This measurement is known as "net metering."

As a condition to its agreement to purchase electricity from Sunrise Energy, West Penn required Sunrise Energy to pay for certain infrastructure improvements. Sunrise Energy did so in two payments: the first payment was in the amount of $29,804.40 and the second was in the amount of $39,147.66.

---

[3] Section 2 of the Alternative Energy Act states that the term electric distribution company "shall have the same meaning given to it in 66 Pa. C.S. Ch. 28 (relating to restructuring of electric utility industry)." 73 P.S. §1648.2. That meaning follows:

> "Electric distribution company." The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility.

66 Pa. C.S. §2803.

2

Amended Complaint, ¶30.  Both parties to the Electric Service Agreement believed that Sunrise Energy was a customer-generator within the meaning of the Alternative Energy Act and, as such, eligible to sell the electricity it generated in excess of what it consumed.  Amended Complaint, ¶97 and Exhibit 2; R.R. 27a-32a.

On May 22, 2014, West Penn terminated its Electric Service Agreement with Sunrise Energy for the stated reason that Sunrise Energy did not qualify for net metering.  Amended Complaint, ¶38.  Stated otherwise, Sunrise Energy lacked a sufficient "native retail load."  Amended Complaint, ¶41.  West Penn asserted that Sunrise Energy was not a consumer-generator but, in actuality, an electric generation supplier.[4]  West Penn notified Sunrise Energy that it intended to compensate Sunrise Energy at a rate other than that set forth in its Net

---

[4] Section 2 of the Alternative Energy Act states that the term electric generation supplier "shall have the same meaning given to it in 66 Pa. C.S. Ch. 28 (relating to restructuring of electric utility industry)."  73 P.S. §1648.2.  That meaning follows:

> "Electric generation supplier" or "electricity supplier."  A person or corporation, including municipal corporations which choose to provide service outside their municipal limits except to the extent provided prior to the effective date of this chapter, brokers and marketers, aggregators or any other entities, that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an electric distribution company.  The term excludes building or facility owner/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related power services to occupants of the building or facility.  The term excludes electric cooperative corporations except as provided in 15 Pa. C.S. Ch. 74 (relating to generation choice for customers of electric cooperatives).

66 Pa. C.S. §2803.  The amended complaint does not support West Penn's contention that Sunrise Energy is an electric generation supplier because there is no allegation that Sunrise Energy sells electricity "to end use customers."

Energy Metering Rider and to recover its prior overpayments. Amended Complaint, ¶43.

On February 20, 2014, two months before West Penn terminated its Electric Service Agreement with Sunrise Energy, the PUC published a proposed amendment to its net metering regulation in the *Pennsylvania Bulletin*. The amendment proposed to require customer-generators to maintain "an independent retail load" in addition to meeting the other requirements for customer-generators set forth in the Alternative Energy Act. The PUC explained its proposed amendment as follows:

> Currently, Section 75.13(a) requires EDCs [Electric Distribution Companies] to offer net metering to customer-generators and provides that EGSs [Electric Generation Suppliers] may offer net metering to customer-generators under the terms and conditions set forth in agreements between the EGS and the customer-generator taking service from the EGS. *The current regulation is silent as to which customer-generators can net meter, other than that they must be using Tier I or Tier II alternative energy sources.*
>
> We have added a provision for DSPs [Default Service Provider] and have moved the EGS net metering role to subsection 75.13(b) and re-lettered the remaining subsections. In our proposed new section (a), we require EDCs and DSPs to offer net metering to customer-generators that generate electricity on the customer-generator's side of the meter using Tier I or Tier II alternative energy sources, on a first come, first served basis, provided they meet certain conditions.
>
> *The first condition requires the customer-generator to have load, independent of the alternative energy system, behind the meter and point of interconnection of the alternative energy system. To be independent, the electric load must have a purpose other than to support the operation, maintenance or administration of the alternative energy system.* This provision

makes explicit what was previously implied in the [Alternative Energy] Act and the regulations.

This requirement is implied in the [Alternative Energy] Act definition of net metering where it states that net metering is the means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by the customer-generator when any portion of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator's requirements for electricity. If there is no independent load behind the meter and point of interconnection for the alternative energy system, by definition, the customer-generator has no requirement for electricity to offset. In addition, this requirement is implied in the current regulations, where it states that EDCs shall offer net metering to customer-generators that generate electricity on the customer-generator's side of the meter. Again, there would be no need for a customer's electric meter if there was no independent demand for electricity. Furthermore, we note that both alternative and traditional electric generation facilities require electric service to start, operate and maintain those facilities. Thus, *to preclude utilities, such as merchant generators, from qualifying for net metering, we require load independent of the generation facility*. To do otherwise would be contrary to the definition of a customer-generator that only includes nonutility owners and operators of alternative energy systems.

44 Pa. B. 4181-4182 (2014) (emphasis added); R.R. 71a-72a. On May 19, 2016, the Independent Regulatory Review Commission disapproved the PUC's proposed regulation for the stated reason that it exceeded the PUC's authority under the Alternative Energy Act.[5] 46 Pa. B. 2919 (2016).

---

[5] The final regulation was originally submitted on March 22, 2016, and was disapproved on May 19, 2016. The order was delivered to the PUC on July 2, 2016.

On August 20, 2014, Sunrise Energy initiated an action against West Penn for refusing to pay for the electricity it received from Sunrise Energy and for terminating the Electric Service Agreement one year before the expiration of the five-year term of the agreement. In its amended complaint, Sunrise Energy asserted the following five counts: Declaratory Judgment (Count I), Breach of Contract (Count II), Quasi-Contract (Count III), Promissory Estoppel (Count IV), and Direct Cause of Action for Alternative Energy Act Violations (Count V). Sunrise Energy sought monetary damages for West Penn's breach of contract or, if the contract was void or voidable, equitable relief because West Penn induced Sunrise Energy to pay for West Penn's infrastructure improvements and because West Penn was being unjustly enriched. It was using Sunrise Energy's excess electricity but not paying for it.

On December 15, 2014, West Penn filed preliminary objections asserting that jurisdiction over the subject matter of the amended complaint rested exclusively with the PUC. The trial court disagreed because the controversy did not arise from, nor was it governed by, the Public Utility Code. The trial court reasoned as follows:

> Under the Public Utility Code, [66 Pa. C.S. §§101-3316,] the PUC is vested with supervisory and regulatory power over all public utilities doing business in the Commonwealth, 66 Pa. C.S. §501(b). While [the trial court] acknowledges that "initial jurisdiction over matters involving the reasonableness, adequacy or sufficiency of a public utility's service, facilities or rates is vested in the PUC," the controversy before the court is not of that kind; it is whether West Penn's net metering termination, and refusal to pay Sunrise [Energy] net metering proceeds, violates [the Alternative Energy Act]. *Resolution of this question depends on, and appears to be wholly dependent on, whether Sunrise [Energy] is a customer-generator, as defined under the [Alternative Energy] Act.*

6

Trial Court op. at 5 (citations and footnote omitted and emphasis in original); R.R. 250a. The trial court concluded that it was competent to decide whether Sunrise Energy was a customer-generator within the meaning of the Alternative Energy Act and overruled West Penn's preliminary objections. West Penn appealed to this Court.[6]

## Issues

On appeal,[7] West Penn contends that the trial court erred. Specifically, it argues that the PUC is vested with exclusive jurisdiction over Count I, which seeks a declaratory judgment that Sunrise Energy is a customer-generator within the meaning of the Alternative Energy Act. Alternatively, West Penn argues that the PUC has primary jurisdiction over the remaining Counts, which means that the trial court should refer the statutory construction question to the PUC and hold the matter in abeyance until the PUC issues its ruling. The PUC has filed an *amicus curiae* brief in support of West Penn's position.

## The Alternative Energy Portfolio Standards Act

Although Pennsylvania is rich in natural gas, coal and oil resources, our General Assembly has made the policy decision to promote the development of

---

[6] The trial court's order overruling West Penn's preliminary objection is interlocutory and, as such, not appealable as of right. However, the trial court certified its order as one that "involves a controlling question of law as to which there is substantial ground for difference of opinion[.]" 42 Pa. C.S. §702(b). *See also* PA. R.A.P. §1311(a) (stating "[a]n appeal may be taken by permission under 42 Pa. C.S. §702(b) (interlocutory appeals by permission) from any interlocutory order of a lower court or other governmental unit.").

[7] This Court's review of a trial court's order overruling preliminary objections to a complaint determines whether the trial court erred as a matter of law. *Pettko v. Pennsylvania American Water Co.*, 39 A.3d 473, 477 n.7 (Pa. Cmwlth. 2012). Because it involves a pure question of law, our standard of review is *de novo* and our scope of review is plenary. *Thierfelder v. Wolfert*, 52 A.3d 1251, 1261 (Pa. 2012).

7

alternative energy sources, such as solar, solar thermal, hydropower and geothermal reserves. *See* Section 2 of the Alternative Energy Act, 73 P.S. §1648.2 (listing sources for the production of electricity that constitute "alternative energy sources").[8] To that end, Section 3(a)(1) of the Alternative Energy Act mandates that

> *electric energy sold* by an electric distribution company or electric generation supplier *to retail electric customers in this Commonwealth shall be comprised of electricity generated from alternative energy sources* and in the percentage amounts as described under subsections (b) and (c).

73 P.S. §1648.3(a)(1) (emphasis added).

To kick-start the development of alternative energy in Pennsylvania, the legislature tasked the PUC to "establish an alternative energy credits program as needed to implement this act."[9] Section 3(e)(1) of the Alternative Energy Act, 72 P.S. §1648.3(e)(1). The legislature also tasked the PUC "to develop technical and net metering interconnection rules for customer-generators ...." Section 5 of the Alternative Energy Act, 73 P.S. §1648.5.[10] Finally, the legislature tasked the Department of Environmental Protection to establish, in cooperation with the Department of Labor and Industry, "reasonable health and safety standards" for

---

[8] This Court has explained that the "purpose of the Alternative Energy Act is to encourage growth and investment in renewable sources of energy." *Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124, 1131 (Pa. Cmwlth. 2015), *appeal denied*, 140 A.3d 14 (Pa. 2016).

[9] Section 3(e)(2) of the Alternative Energy Act states that the PUC will approve an independent entity to serve as "alternative energy credits program administrator," with the "powers and duties assigned by [PUC] regulations." 73 P.S. §1648.3(e)(2).

[10] The legislature did not specify that these "rules" were to be produced in the form of a regulation, as it did specify for the alternative energy credits program, at least indirectly. 73 P.S. §1648.3(e)(2).

alternative energy facilities.  Section 6 of the Alternative Energy Act, 73 P.S. §1648.6.

Section 2 of the Alternative Energy Act defines a customer-generator as:

> *A nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50 kilowatts if installed at a residential service or not larger than 3,000 kilowatts at other customer service locations*, except for customers whose systems are above three megawatts and up to five megawatts who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the regional transmission organization or where a microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, wastewater treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an electric distribution company, electric cooperative or municipal electric system have been promulgated by the Institute of Electrical and Electronic Engineers and the Pennsylvania Public Utility Commission.

73 P.S. §1648.2 (emphasis added).  Section 5 of the Alternative Energy Act requires utilities to purchase the electricity generated by a customer-generator at the full retail price.  It states in full:

> *Excess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis.  The [PUC] shall develop technical and net metering interconnection rules for customer-generators intending to operate renewable onsite generators in parallel with the electric utility grid*, consistent with rules defined in other states within the service region of the regional transmission organization that manages the transmission system in any part of this Commonwealth.  The [PUC] shall convene a stakeholder

9

process to develop Statewide technical and net metering rules for customer-generators. The [PUC] shall develop these rules within nine months of the effective date of this act.

73 P.S. §1648.5 (emphasis added). The PUC has promulgated a regulation on "technical and net metering interconnection rules" for customer-generators that "operate renewable onsite generators" that is set forth in Title 52 of the Pennsylvania Code, Chapter 75, Subchapter B "Net Metering." *See* 52 Pa. Code §§75.11 – 75.15. The regulation states, in relevant part, as follows:

> (a) EDCs [Electric Distribution Companies] shall offer net metering to customer-generators that generate electricity on the customer-generator's side of the meter using Tier I or Tier II alternative energy sources, on a first come, first served basis. EGSs [Electric Generation Suppliers] may offer net metering to customer-generators, on a first come, first served basis, under the terms and conditions as are set forth in agreements between EGSs and customer-generators taking service from EGSs.

52 Pa. Code §75.13(a).[11]

Absent from the Alternative Energy Act is an enforcement provision. The legislature did not create a statutory remedy, for example, for the customer-generator who is rebuffed by an EDC or EGS. The legislature did not authorize the PUC to impose sanctions upon utilities that refuse to comply with the terms of the statute. The Alternative Energy Act authorizes the PUC to establish "technical and net metering interconnection rules," but it does not give the PUC power to act beyond this narrow authorization. *See* Section 5 of the Alternative Energy Act, 73 P.S. §1648.5. The statute does not authorize the PUC to conduct hearings to

_____

[11] *See* n.3, 4, *supra*, for definitions of an electric distribution company and electric generation supplier.

10

resolve disputes between two private parties engaged in a net metering arrangement. It is silent on these matters.

### Definition of Customer-Generator

The amended complaint asserts that Sunrise Energy conforms precisely to the statutory definition of customer-generator set forth in Section 2 of the Alternative Energy Act. 73 P.S. §1648.2.[12] Sunrise Energy's "net metered distributed generation system" has "a nameplate capacity ... not larger than 3,000 kilowatts." Amended Complaint, ¶15. Sunrise Energy observes that the only statutory limitation upon a non-residential service consumer seeking to qualify as a "customer-generator" is upon its capacity to generate electricity. *Id.*

West Penn responds that Sunrise Energy has taken the word "net" out of "net metering." It argues that unless a customer-generator purchases electricity for purposes beyond what is needed to generate alternative electricity, it is not a true customer-generator under the Alternative Energy Act. To this, Sunrise Energy responds that West Penn's legal argument depends upon facts not pled in the amended complaint. It also responds that West Penn's understanding of what constitutes a true customer-generator adds language to the existing statutory definition. Section 2 of the Alternative Energy Act limits the amount of electricity

---

[12] The PUC's proposal to amend this regulation will require the customer-generator to use electricity for "a purpose other than to support the organization, maintenance or administration of the alternative energy." *See* 44 Pa. B. 4182 (2014). The amendment does not specify the minimum amount that must be used for this other purpose.

Sunrise Energy consumes a relatively small amount of electricity compared to the amount it generates. *See* Amended Complaint, Ex. 4; R.R. 38a. West Penn argues that Sunrise Energy is consuming electricity only for maintaining and administering the net-metering system. West Penn Brief at 30. However, this factual averment does not appear in the Amended Complaint. In considering West Penn's preliminary objections, we are bound by the facts as pled.

11

a customer-generator may produce for sale, but it does not require the customer-generator to purchase a minimum amount of electricity. Likewise, the statute does not specify how the customer-generator must use the electricity that it purchases from the EDC or EGS.

We need not decide the merits of these arguments. The only question is whether these statutory construction arguments must, in the first instance, be heard by the PUC.

**Jurisdiction**

Our Supreme Court has instructed that where the General Assembly has

> seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise and broad regulatory and remedial powers to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency. Full utilization of the expertise derived from the development of various administrative bodies would be frustrated by indiscriminate judicial intrusions into matters within the various agencies' respective domains.

*Feingold v. Bell of Pennsylvania*, 383 A.2d 791, 793 (Pa. 1977). Our Supreme Court also noted that "[a]s with all legal rules," this one is not inflexible. *Id.* A court may exercise jurisdiction where the administrative remedy is not adequate. *Id.* "The mere existence of a remedy does not dispose of the question of its adequacy; the administrative remedy must be 'adequate and complete.'" *Id.* at 794 (citation omitted). Where a statutory procedure would be of "little, if any, utility," it may be bypassed. *Borough of Green Tree v. Board of Property Assessments*, 328 A.2d 819, 825 (Pa. 1974). Accordingly, a challenge to the constitutionality of

12

a taxing statute may be initiated in equity, notwithstanding the statutory remedy for challenging a tax assessment. *Id.* This is because where the validity of the statute is concerned, "less need exists for the agency involved to throw light on the issue through exercise of its specialized fact-finding function or application of its administrative expertise." *Id.*

In *Feingold*, the Supreme Court considered the question of whether a civil action seeking breach of contract damages and equitable relief could proceed in a court of common pleas or, rather, should be heard by the PUC. In considering this question, the Supreme Court explained as follows:

> It is relevant to the case now before us that the statutory array of PUC remedial and enforcement powers does not include the power to award damages to a private litigant for breach of contract by a public utility. Nor can we find an express grant of power from which the power to award such damages can be fairly implied. Thus, it can be concluded that the Legislature did not intend for the PUC to have such a power.

*Feingold*, 383 A.2d at 794. The Supreme Court noted that had the plaintiff "sought only equitable relief, in the form of an injunction, the lower court's dismissal would have found more support in prior case law." *Id.* at 795, n.5.

In sum, an administrative agency has exclusive jurisdiction where the legislature has given it the power to adjudicate on a particular subject matter. Stated otherwise, a statutory remedy "must be strictly pursued and such remedy is exclusive" ... "unless the jurisdiction of the courts is preserved thereby." *Lashe v. Northern York County School District*, 417 A.2d 260, 263-64 (Pa. Cmwlth 1980). The doctrine of exclusive jurisdiction requires that

> [i]n all cases where a remedy is provided, or duty enjoined, or anything directed to be done by an act or acts of assembly of

13

> this commonwealth, [t]he directions of the said acts shall be strictly pursued.

*Borough of Green Tree*, 328 A.2d at 823. Where a court concludes that an agency has exclusive jurisdiction, it will dismiss the action.

Sometimes a statutory remedy does not involve a state or local agency but, rather, a court; sometimes the statutory remedy is not exclusive. *See, e.g., Hoover v. Bucks County Tax Claim Bureau*, 405 A.2d 562 (Pa. Cmwlth. 1979) (holding that the statutory procedure for challenging the adequacy of a tax sale notice before a court of common pleas is not exclusive of an equitable remedy). More typically, however, the statutory remedy does involve an administrative agency, as in *Feingold*. Where a court concludes that it has "*concurrent statutory jurisdiction over a dispute* but that an issue ... is within the primary jurisdiction of an agency, *the court will defer any decision* in the dispute ... until the agency has addressed the issue that is within its primary jurisdiction." 2 Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE §14.1 at 1161 (5th ed. 2010) (emphasis added). The doctrine of primary jurisdiction is comparable to exhaustion of administrative remedies; both doctrines allocate adjudicatory responsibility between courts and agencies. *Id.* at 1162. In *Pettko v. Pennsylvania American Water Co.*, 39 A.3d 473, 479 (Pa. Cmwlth. 2012), we explained as follows:

> [T]he doctrine of primary jurisdiction permits the bifurcation of a plaintiff's claim, whereby a trial court, faced with a claim requiring the resolution of an issue that is within the expertise of an administrative agency, will first cede the analysis of the issue or issues to that agency. Once the agency resolves the particular issue or issues over which it has primary jurisdiction, the trial court may proceed, if necessary, to apply the agency's decision to the dispute remaining before the trial court.

*Id.*

14

Whether a matter lies within the exclusive jurisdiction or the primary jurisdiction of an agency is for the legislature to direct by statute. *Borough of Green Tree*, 328 A.2d at 823. The overarching principle of either doctrine is deference to the will of the legislature in its establishment of a statutory remedy.

**I**.

West Penn contends that the PUC has exclusive jurisdiction over the question of whether Sunrise Energy is a customer-generator within the meaning of the Alternative Energy Act. The trial court held that statutory construction is a matter for the courts. Further, unlike the pervasive regulatory scheme set up in the Public Utility Code, 66 Pa. C.S. §§101-3316, the Alternative Energy Act confers no authority upon the PUC to adjudicate matters arising under the Alternative Energy Act. We agree with the trial court.

Even where a statute provides a remedy for its enforcement, as the Public Utility Code does on matters relating to the reasonableness of a utility's service and rates, *Feingold* teaches that the statutory remedy must be adequate and complete. In *Feingold*, the statutory remedy in the Public Utility Code was held not to be adequate because the plaintiff sought damages for breach of contract, and contract damages cannot be awarded by an administrative agency. *Feingold*, 383 A.2d at 794. Nor is the statutory remedy adequate where the constitutionality of the governing statute is the issue. *Borough of Green Tree*, 328 A.2d at 825.

Here, there is no statutory remedy in the Alternative Energy Act whose "adequacy" is in doubt and, accordingly, this is not a close case. The Alternative Energy Act does not vest the PUC with "an array of [ ] remedial and enforcement powers." *Feingold*, 383 A.2d at 794. The PUC does not have the power to adjudicate the subject matter of the amended complaint, *i.e.*, whether

15

Sunrise Energy meets the statutory definition of "customer-generator." Accordingly, we reject West Penn's claim that the PUC has exclusive jurisdiction to decide the merits of Count I of the amended complaint. Simply, there is no statutory remedy provided in the Alternative Energy Act for resolving disputes arising thereunder. The trial court correctly rejected West Penn's contention that the PUC has exclusive jurisdiction to decide whether Sunrise Energy is a customer-generator as defined in Section 2 of the Alternative Energy Act.

## II.

Alternatively, West Penn argues that the PUC has primary jurisdiction over the remaining Counts in the amended complaint. It argues that the trial court should allow the PUC, in the first instance, to decide the statutory construction question. After it does so, the trial court may then, if necessary, conduct a hearing on Sunrise Energy's breach of contract and quasi-contract claims.[13] The PUC, which has filed an *amicus curiae* brief, contends that allowing a court of common pleas to construe the meaning of "customer-generator" will lead to different results in different counties and thereby balkanize the electric service industry in Pennsylvania. In support of the argument that the PUC should decide whether Sunrise Energy is a customer-generator, West Penn and the PUC direct the Court to *Morrow v. Bell Telephone Company of Pennsylvania*, 479 A.2d 548 (Pa. Super. 1984).

In *Morrow*, a customer of Bell Telephone of Pennsylvania filed a civil action in a court of common pleas alleging that it was being overcharged for

---

[13] Should West Penn prevail on the statutory construction issue, this may make the Electric Service Agreement void or voidable. This would leave Sunrise Energy's quasi-contract claims and promissory estoppel claims for disposition.

certain services, such as fees for restoring suspended service. Bell Telephone filed preliminary objections, asserting that the trial court lacked subject matter jurisdiction because all of the charges challenged by the plaintiff had been approved by the PUC and set forth in Bell Telephone's tariff.[14] Indeed, it was mandatory that Bell Telephone impose the specific charges on the plaintiff unless and until the PUC approved a new tariff.

The trial court agreed and dismissed the action. On appeal, the Superior Court affirmed. It explained:

> [*The customer's*] *equity action was a challenge to* [*the telephone company's*] *rates and to its service practices. Rates and practices regarding deposits are peculiarly and exclusively within the jurisdiction and expertise of the* [*PUC*]. Therefore, they must be addressed by that body. Although [the customer's] complaint contains averments of breach of contract, these averments are but a cover disguising the real thrust of his complaint, which is to challenge the adequacy and propriety of [the telephone company's] rates and service practices.

*Morrow*, 479 A.2d at 551 (footnote omitted) (emphasis added).

*Morrow* is inapposite. It involved a subject, *i.e.*, the utility's schedule of approval rates, or "tariff," on which the legislature has expressly conferred jurisdiction in the PUC. *See* Section 1308(b) of the Public Utility Code

---

[14] A utility tariff has been defined by this Court as follows:

> A tariff is a set of operating rules imposed by the State that a public utility must follow if it wishes to provide services to customers. *It is a public document which sets forth the schedule of rates and services and rules, regulations and practices regarding those services*.

*PPL Electric Utilities Corporation v. Pennsylvania Public Utility Commission*, 912 A.2d 386, 402 (Pa. Cmwlth. 2006) (emphasis added).

17

(establishing a statutory remedy for challenging an approved tariff or rate).[15] This is not a utility rate case.

West Penn tries to make Sunrise Energy's action a rate case by noting that the Net Energy Metering Rider is incorporated into the Electric Service Agreement as part of West Penn's retail electric Tariff No. 39 on file with the PUC. R.R. 167a (West Penn Brief in support of Preliminary Objections at 4, n.3). The key "billing program" term that is set forth in the Net Energy Metering Rider states as follows:

> The customer-generator will receive a credit for each kilowatt-hour received by [West Penn] up to the total amount of electricity delivered to the Customer during the billing period at the full retail rate, consistent with [PUC] regulations. On an annual basis, [West Penn] will compensate the customer-generator for kilowatt-hours received from the customer-generator in excess of the kilowatt hours delivered by [West

---

[15] It states, in relevant part, as follows:

> Hearing and suspension of rate change.--Whenever there is filed with *the [PUC] by any public utility any tariff stating a new rate, the [PUC] may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate*, and pending such hearing and the decision thereon, the [PUC], upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the [PUC] shall establish a temporary rate as authorized in section 1310 (relating to temporary rates).

66 Pa. C.S. §1308(b) (emphasis added). Section 1308(b) of the Public Utility Code confers exclusive jurisdiction in the PUC to conduct hearings on a utility's new rate upon the filing of a complaint by a customer of the utility. There is no analog to Section 1308(b) in the Alternative Energy Act, which is silent on where, or how, a person claiming a violation of the Alternative Energy Act should proceed.

18

Penn] to the customer-generator during the preceding year at the full retail value for all energy produced consistent with [PUC] regulations. The customer-generator is responsible for the customer charge, demand charge and other applicable charges under the applicable Rate Schedule.

R.R. 41a.[16] That this rider language is part of West Penn's tariff does not make this a rate case.

The word "tariff" does not appear in the Alternative Energy Act. Nevertheless, the PUC's regulation provides that "[a]n EDC shall file a tariff with the [PUC] that provides for net metering consistent with this chapter." 52 Pa. Code §75.13(b). However, this so-called net metering tariff is the obverse of a true tariff. A tariff sets what the *utility will collect* for its service. *PPL Electric Utilities Corporation v. Pennsylvania Public Utility Commission*, 912 A.2d 386, 402 (Pa. Cmwlth. 2006). The net metering tariff sets forth what the *utility will pay* for electricity. Further, the amount that the utility will pay for the customer-generator's excess electricity has been established by the legislature in Section 5 of the Alternative Energy Act, *i.e.*, the "full retail value." 73 P.S. §1648.5.

A true tariff was at issue in *Morrow*, *i.e.*, a schedule of the charges the utility collected in exchange for providing service. The PUC approved those

---

[16] The Electric Service Agreement also states in relevant part:

[West Penn] and [Sunrise Energy] mutually agree, with the intent to be legally bound, as follows:

1. [West Penn's] tariff rules and regulations ("Rules and Regulations") as they now exist, or may be amended from time to time, are incorporated into and made part of this Agreement. The Rules and Regulations are in addition to and supplement this Agreement. Therefore, they shall be interpreted and read to be consistent with the paragraphs of this Agreement.

R.R. 27a.

charges after determining that they met the standards in the Public Utility Code. 66 Pa. C.S. §1301 (stating that every "rate made, demanded, *or received* by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission.") (emphasis added). To make this determination, the PUC had to bring its expertise to bear on the matter and exercise discretion.

By contrast, West Penn's Net Energy Metering Rider, on file with the PUC, simply recites what is stated in Section 5 of the Alternative Energy Act. The PUC did not have to exercise any discretion with respect to this "tariff." Indeed, instead of calling it a "tariff," the PUC could have just as easily called it a "rule," which is the term actually used by the legislature in the Alternative Energy Act.[17] Regardless, West Penn's "tariff" is outside the scope of this litigation, which will determine, simply, whether Sunrise Energy is a customer-generator eligible for net metering. Whatever the litigation's outcome, it will not require a change to a single word in West Penn's tariff or its "net energy metering rider."

The PUC claims authority to adjudicate the meaning of "customer-generator" by reason of the General Rules of Administrative Practice and Procedure (GRAPP), which authorizes agencies to hear petitions for declaratory orders. The pertinent rule states:

> §35.19. Petitions for declaratory orders.
>
> Petitions for the issuance, in the discretion of an agency, of a declaratory order to terminate a controversy or remove uncertainty, shall state clearly and concisely the controversy or

---

[17] The legislature has established the amount the utility must pay to compensate customer-generators for their excess electricity. Although the PUC requires the utility to file a net energy metering rider with the PUC, this filing requirement is redundant of the statute and unnecessary.

20

uncertainty which is the subject of the petition, shall cite the statutory provision or other authority involved, shall include a complete statement of the facts and grounds prompting the petition, together with a full disclosure of the interest of the petitioner.

1 Pa. Code §35.19. The PUC argues that if it is not allowed to issue a declaratory order in this case, and in other similar cases, the electric service industry in Pennsylvania will be beset by inconsistencies. The PUC further argues that it will not be able to offer its point of view in such cases because it cannot participate as an *amicus curiae*. The PUC explains that, as the putative adjudicator of disputes arising from the Alternative Energy Act, it must be neutral on the statutory construction question.

First, an agency cannot confer authority upon itself by regulation. Any power exercised by an agency must be conferred by the legislature in express terms. *Aetna Casualty and Surety Company v. Commonwealth of Pennsylvania, Insurance Department*, 638 A.2d 194, 200 (Pa. 1994) (stating that an agency can only exercise powers "conferred upon it by the Legislature in clear and unmistakable language") (citation omitted). The petition for declaratory order authorized by GRAPP assumes an underlying statutory basis for the agency's exercise of an adjudicatory function. The Alternative Energy Act directed the PUC to set technical net metering interconnection rules. To the extent the PUC has adjudicatory authority, it is, at most, authority to clarify the technicalities of those rules. *Cf. ARIPPA v. Pennsylvania Public Utility Commission*, 966 A.2d 1204 (Pa.

21

Cmwlth. 2009). The PUC does not enjoy a roving mandate to adjudicate on the construction of the Alternative Energy Act.[18]

Second, we reject the PUC's argument that it may not participate in a common pleas court proceeding as *amicus curiae* because, as an adjudicator, it must remain neutral on the meaning of customer-generator. This is disingenuous. The PUC has already gone on record as stating that it believes the Alternative Energy Act implicitly requires customer-generators to have a native retail load. 44 Pa. B. 4179 (2014); R.R. 62a-91a.

The PUC argues that allowing the Court of Common Pleas of Washington County to construe the definition of customer-generator in the Alternative Energy Act will balkanize our electric service industry. This assumes that Pennsylvania's courts of common pleas will be unpersuaded by the ruling from the Court of Common Pleas of Washington County. It also assumes that neither party will appeal. An appeal will establish a single ruling of statewide effect. Development in the law, whether in common law, constitutional law or statutory law, often begins with a single holding by a court with original jurisdiction. *See, e.g., Mayle v. Pennsylvania Department of Highways*, 388 A.2d 709 (Pa. 1978) (abolishing sovereign immunity in a case that began with a

---

[18] As noted, the PUC has a duty to set "technical interconnection rules," but the legislature did not specify that these "rules" be established by a regulation as it did with respect to the alternative energy credits program. *Compare* Section 3(e)(2) and Section 5 of the Alternative Energy Act, 73 P.S. §§1648.3(e)(2), 1648.5.

The PUC's existing regulation defines "customer-generator" in language that is identical to that used by the legislature in the Alternative Energy Act. *Compare* 52 Pa. Code §75.1 and Section 2 of the Alternative Energy Act, 73 P.S. §1648.2. The PUC's proposed amendment will add the words "retail electric customer" to the regulation's definition of "customer-generator." 44 Pa. B. 4179 (2014), Annex A. The PUC describes generators without a sufficient retail load as "merchant generators," which is a term that does not appear in the Alternative Energy Act.

22

complaint in trespass filed in Commonwealth Court's original jurisdiction). In short, the PUC's posited parade of horribles to follow from having a judge, commissioned pursuant to Article V of the Pennsylvania Constitution, decide the present statutory construction question is not very persuasive.

In any case, the PUC's proffered policy arguments and bleak predictions are best addressed to the General Assembly, which has the power to amend the Alternative Energy Act to include a statutory remedy. The General Assembly may also, if it deems it appropriate, amend the definition of customer-generator. Indeed, Section 7 of the Alternative Energy Act contemplates that the PUC and the Department of Environmental Protection will file an annual report with "the chairman and minority chairman of the Environmental Resources and Energy Committee of the Senate" and their counterparts in the House of Representatives. 73 P.S. §1648.7(c). That report "shall include at a minimum ... [r]ecommendations for program improvements." *Id.*

The Alternative Energy Act is not part of the Public Utility Code. The legislature has authorized the PUC to develop "technical and net metering interconnection rules." *See* Section 5 of the Alternative Energy Act, 73 P.S. §1648.5. This limited authority does not give the PUC jurisdiction to decide eligibility for net metering.[19] Eligibility has been fully established by the legislature in the Alternative Energy Act.

---

[19] In *ARIPPA v. Pennsylvania Public Utility Commission*, 966 A.2d 1204, 1207 (Pa. Cmwlth. 2009), two electric distribution companies requested a declaratory order from the PUC that "the electric distribution company owned the alternative energy credits." The intervenor, ARIPPA, appealed the PUC's adjudication asserting, *inter alia*, that the PUC lacked subject matter jurisdiction. This Court rejected this argument, noting, *inter alia*, that ARIPPA did not raise this argument until its appeal to this Court. This Court also held that the question at issue in *ARIPPA* dealt with the ownership and transfer of energy credits as set forth in the PUC's regulation. It **(Footnote continued on the next page . . .)**

23

Not every case that involves a public utility must be presented, first, to the PUC. Such a rule would be contrary to our Supreme Court's directive in *DeFrancesco v. Western Pennsylvania Water Company*, 453 A.2d 595 (Pa. 1982).

In *DeFrancesco*, two property owners brought negligence claims against a water company for not supplying water pressure sufficient to allow firefighters to put out the fire that destroyed their properties. The water company asserted that the claim belonged before the PUC, and the Superior Court agreed. Our Supreme Court reversed, explaining:

> The controversy now before us, however, is not one in which the general reasonableness, adequacy or sufficiency of a public utility's service is drawn into question. *Resolution of appellant's claims depended upon no rule or regulation predicated on the peculiar expertise of the PUC*, no agency policy, no question of service or facilities owed the general public, and no particular standard of safety or convenience articulated by the PUC.
>
> * * *
>
> *Resolving the essential question of whether the utility failed to perform its mandated duties requires no recondite knowledge or experience and falls within the scope of the ordinary business of our courts.*

*Id.* at 597 (footnote omitted) (emphasis added). The Supreme Court concluded that the PUC's regulatory powers did not strip a trial court of jurisdiction simply because the common law action may involve a regulated public utility.

---

**(continued . . .)**

required construction of the PUC's regulation on energy credits, not a construction of the Alternative Energy Act. The instant case has nothing to do with the PUC's alternative energy credit program. Likewise, the PUC's technical interconnection rules for customer-generators are not relevant to West Penn's defense.

Whether Sunrise Energy is a customer-generator must be resolved by construing the language of the Alternative Energy Act, which expressly defines "customer-generator." Our courts of common pleas construe statutes every day. Accordingly, we have explained that:

> [C]ourts should not develop a "dependency" on "agencies whenever a controversy remotely involves some issue falling arguably within the domain of the agency's 'expertise,'" because *expertise is not a talisman dissolving a court's jurisdiction, nor should accommodation to the administrative function be an abdication of judicial responsibility*.

*County of Erie v. Verizon North, Inc.*, 879 A.2d 357, 363 (Pa. Cmwlth. 2005) (quoting *Elkin v. Bell Telephone Company*, 420 A.2d 371, 377 (Pa. 1980)) (emphasis added).[20] A party to a civil action cannot compel a trial court to relinquish its jurisdiction to an administrative agency just because one litigant prefers the agency to decide the issue.

## Conclusion

The trial court did not err by refusing to cede jurisdiction to the PUC. Statutory construction is a responsibility of the judiciary, not the executive branch. West Penn's argument that the PUC has exclusive or primary jurisdiction over the Amended Complaint lacks a foundation in the Alternative Energy Act, which does

---

[20] In *Elkin*, after conducting an evidentiary hearing, the PUC dismissed Elkin's complaint that Bell Telephone had failed to furnish "reasonable, rapid and efficient service." 420 A.2d at 373. Elkin did not appeal this adjudication but filed a tort claim in common pleas court. Bell Telephone argued that Elkin's tort claim constituted a collateral attack on the PUC's adjudication, and the Supreme Court agreed. Nevertheless, our Supreme Court reiterated that administrative expertise is "no talisman dissolving a court's jurisdiction." *Id.* at 376. *Elkin* is inapposite to this case. *Elkin* arose under the Public Utility Code, and it concerned adequacy of utility service, which, as acknowledged here by the trial court, is a subject matter committed to the PUC.

does not confer enforcement powers upon any state agency. For these reasons, the order of the trial court is affirmed and the matter is remanded for further proceedings consistent with this opinion.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sunrise Energy, LLC             :
                                        :
            v.                   :     No. 1282 C.D. 2015
                                          :
FirstEnergy Corp. and West Penn    :
Power Company,                    :
                 Appellants     :

# **O R D E R**

AND NOW, this 14th day of October, 2016, the order of the Washington County Court of Common Pleas dated June 1, 2015, in the above-captioned matter is AFFIRMED. Accordingly, the matter is REMANDED for further proceedings in accordance with the attached opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Sunrise Energy, LLC | : | |
| | : | |
| v. | : | No. 1282 C.D. 2015 |
| | : | Argued: June 8, 2016 |
| FirstEnergy Corp. and West Penn | : | |
| Power Company, | : | |
| Appellants | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                    HONORABLE RENÉE COHN JUBELIRER, Judge
                    HONORABLE ROBERT SIMPSON, Judge
                    HONORABLE P. KEVIN BROBSON, Judge
                    HONORABLE PATRICIA A. McCULLOUGH, Judge
                    HONORABLE ANNE E. COVEY, Judge
                    HONORABLE MICHAEL H. WOJCIK, Judge

**DISSENTING OPINION**
**BY JUDGE COHN JUBELIRER**           **FILED: October 14, 2016**

I respectfully disagree with the majority that answering the questions of what is a "customer-generator" and what constitutes "net metering" under the Alternative Energy Portfolio Standards Act (AEPS Act),[1] as implemented under a tariff of a public utility, is not within the jurisdiction of the Public Utility Commission (PUC). Although the majority justifies its exclusion of the PUC from

---

[1] Act of November 30, 2004, P.L. 1672, as amended, 73 P.S. §§ 1648.1−1648.8. "The purpose of the [AEPS] Act is to encourage growth and investment in renewable sources of energy. The [AEPS] Act achieves this goal by requiring that '[e]xcess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis.' 73 P.S. § 1648.5 (emphasis added)." Dauphin Cnty. Indus. Dev. Auth. v. Pa. Pub. Util. Comm'n, 123 A.3d 1124 (Pa. Cmwlth. 2015), appeal denied, 140 A.3d 14 (Pa. 2016).

this determination on the basis that "[s]tatutory construction is a responsibility of the judiciary," (Maj. Op. at 25), all administrative agencies operate within a statutory framework. It is beyond purview that the PUC is empowered with jurisdiction over the supervision and regulation of all public utilities and their provision of services in the Commonwealth, the restructuring of the electric utility industry, matters related to public utility tariffs, and provisions of the AEPS Act, and is considered to have specialized expertise to which the courts are to defer when reviewing decisions within its expertise. See, e.g., ARIPPA v. Pa. Pub. Util. Comm'n, 966 A.2d 1204, 1211-13 (Pa. Cmwlth. 2009) (finding that the PUC has jurisdiction, and thus authority, to determine who owns alternative energy credits under the AEPS Act, "a process that implicates the particular expertise of the [PUC,]" and that such determinations are given great deference); Pa. Power Co. v. Pa. Pub. Util. Comm'n, 932 A.2d 300, 307 (Pa. Cmwlth. 2007) (stating that the PUC's "interpretation of the AEPS Act is entitled to great deference and will not be reversed unless clearly erroneous"); Cnty. of Erie v. Verizon North, Inc., 879 A.2d 357, 364 (Pa. Cmwlth. 2005) (stating that matters related to public utility tariffs are peculiarly within the expertise of the PUC and, as such, are outside the original jurisdiction of the courts).

The majority's critical mistake is evaluating the AEPS Act in a vacuum instead of *in pari materia* with the relevant portions of the Public Utility Code[2] and the Electric Generation Customer Choice and Competition Act (Competition Act),[3] all of which govern the provision of safe, reliable, and efficient electrical service. The determination of whether a generation facility qualifies as a "customer-

---

[2] Act of July 1, 1978, P.L. 598, 66 Pa. C.S. §§ 101-3316.
[3] Act of December 3, 1996, P.L. 802, 66 Pa. C.S. §§ 2801-2815.

generator," thus entitling it to the special compensation provisions of "net-metering," has a significant impact on the provision of electric service, and is intertwined with the interpretation and application of West Penn Power Company's (West Penn) tariff and its provision of services to its other customers. I believe that is why the Legislature explicitly gave the PUC "the power to carry out the responsibilities delineated within th[e AEPS A]ct," including specific authority to develop regulations on net metering for customer-generators. Sections 5 and 7 of the AEPS Act, 73 P.S. §§ 1648.5, 1648.7. Importantly, the interpretation of these Acts must be uniform and consistent throughout the Commonwealth without regard to the location of a generation facility. Because it is clear to me that the PUC has jurisdiction over this determination, I must respectfully dissent.

The Pennsylvania Supreme Court has instructed that "[t]o accommodate the role of the court with that of the agency, the doctrine of primary jurisdiction (or primary exclusive jurisdiction) has been developed." Elkin v. Bell Telephone Company, 420 A.2d 371, 376 (Pa. 1980). This doctrine "creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence." Id. (citing Feingold v. Bell of Pennsylvania, 383 A.2d 791, 798-99 (Pa. 1977) (Pomeroy, J., dissenting)). Importantly for our purposes, this doctrine "*requires judicial abstention* in cases where protection of the integrity of a regulatory scheme dictates preliminary resort *to the agency which administers the scheme*." Id. (emphasis added) (quoting Weston v. Reading Railroad Co., 282 A.2d 714 (Pa. 1977) (quoting United States v. Western Pacific Railroad Co., 352 U.S. 59, 68 (1956))). Our Supreme Court recognized that the courts must not be "too hasty in referring a matter to an agency," and must

evaluate whether doing so would be "a true fostering of the purposes of the doctrine . . . ." Id. at 377. Thus, we are to refer a matter to an agency where:

> the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar . . . . Also weighing in the consideration should be the need for uniformity and consistency in agency policy and the legislative intent.

Id. at 376-77.

This case meets the Elkin requirements and requires judicial abstention in favor of the PUC with regard to these questions. The PUC is the agency that "administers the [regulatory] scheme" under the AEPS Act. The Legislature expressly conferred upon the PUC "the power to carry out the responsibilities delineated within th[e AEPS A]ct" and to "monitor the performance of all aspects of th[e] act," in cooperation with the Department of Environmental Protection (DEP). 73 P.S. §§ 1648.5, 1648.7. In 17 instances, the AEPS Act references the PUC and confers upon it specific duties and responsibilities to implement the Act, such as the authority to develop regulations on net metering interconnection standards for customer-generator facilities. See, e.g., Sections 2, 3, 5, and 7 of the AEPS Act, 73 P.S. §§ 1648.2, 1648.3, 1648.5, 1648.7.[4] In compliance with its

---

[4] See, e.g., 73 P.S. § 1648.2 (definition of "customer-generator" requires that the PUC promulgate technical rules for operating generators interconnected with facilities of an electric distribution company (EDC); definition of "force majeure" requires, *inter alia*, that the PUC shall determine if alternative energy resources are reasonably available in the marketplace in sufficient quantities for the electric distribution companies and electric generation suppliers to meet their obligations under the Act); 73 P.S. § 1648.3(e)(1)-(3), (11) (requiring that the PUC establish an alternative energy credits program, as needed, to implement the Act, and approve an independent entity to serve as the alternative energy credits program administrator; providing that the PUC will approve qualifying meters); 73 P.S. § 1648.7 (requiring that the PUC and the DEP conduct an ongoing alternative energy resources planning assessment for the

*(Continued…)*

mandate, the PUC promulgated those regulations. <u>See</u> AEPS Act Regulations codified at Title 52 (Public Utilities), Part I (Public Utility Commission), Subpart C (Fixed Service Utilities), 52 Pa. Code §§ 75.1-75.70. The AEPS Act regulations govern disputes concerning the application of the technical and net metering interconnection rules, promulgated by the PUC, which apply to "customer-generators." 52 Pa. Code §§ 75.31, 75.51. Section 75.51 provides, in pertinent part, as follows:

> (a) A party shall attempt to resolve all disputes regarding interconnection[5] as provided *in this chapter* promptly, equitably, and in a good faith manner.

> (b) *When a dispute arises, a party may seek immediate resolution through complaint procedures available through the [PUC],* or an alternative dispute resolution process approved by the [PUC], by providing written notice to the [PUC] and the other party stating the issues in dispute.

> * * *

52 Pa. Code § 75.51(a)-(b) (emphasis added). The above regulation, promulgated in accordance with the Legislature's express grant of power to do so, directs an obviously aggrieved "customer-generator" "who is rebuffed by" an electric generation company (EDC) or electric generation supplier (EGS) to use the

---

Commonwealth, which will, at a minimum, *identify current and operating alternative energy facilities*, the potential to add future alternative energy generating capacity and the conditions of the alternative energy marketplace).

[5] The issue in this case involves an "interconnection" dispute because Sunrise Energy, LLC is an operating generator facility that is interconnected with West Penn's distribution facility, and is thus, purportedly, a "customer-generator" subject to the technical and net metering interconnection standards developed by the PUC.

complaint procedures available through the PUC, as set forth in Section 701 of the Public Utility Code, 66 Pa. C.S. § 701.[6]

Moreover, the Public Utility Code and the AEPS Act both involve the regulation of EDCs, EGSs, and the sale of electric energy to retail customers in the Commonwealth. The AEPS Act is replete with references to the Public Utility Code, including 66 Pa. C.S. §§ 511, 1307, 2807, 2808, 2812, and 3315, and also makes express use of certain definitions found within the Competition Act of the Public Utility Code, 66 Pa. C.S. § 2803. See 73 P.S. §§ 1648.2, 1648.3. There is no question that the PUC is the agency that "administers the [regulatory] scheme" under the Public Utility Code. Although this may not be "a utility rate case," (Maj. Op. at 17-18.), the Competition Act requires EDCs, like West Penn, to purchase

---

[6] Section 701 of the Public Utility Code provides, in pertinent part, as follows:

*The [PUC], or any* person, *corporation*, or municipal corporation *having an interest in the subject matter, or any public utility concerned, may complain in writing*, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, *of any law which the [PUC] has jurisdiction to administer, or of any regulation or order of the [PUC].* Any public utility, or other person, or corporation likewise may complain of any regulation or order of the [PUC], which the complainant is or has been required by the [PUC] to observe or carry into effect.

\* \* \*

66 Pa. C.S. § 701 (emphasis added). Section 5.21 of the PUC regulations also provide, in pertinent part:

(a)    A person complaining of an act done or omitted to be done by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation *of a statute which the [PUC] has jurisdiction to administer*, or of a regulation or order of the [PUC], may file a formal complaint with the [PUC].

52 Pa. Code § 5.21 (emphasis added).

RCJ-6

energy from a "customer-generator" in a manner that ensures adequate and reliable service at the least cost to customers over time. Competition Act, as amended, 66 Pa. C.S. § 2807(e)(3.4). Thus, the AEPS Act regulations implement this requirement by requiring EDCs, like West Penn, to offer net metering to certain customer-generators and to enter into net metering agreements with those customer-generators. The regulations also prescribe the *rate* at which a customer-generator will be compensated for energy produced, the amount to be paid for excess energy generated, and other costs under an agreement. See 52 Pa. Code § 75.13. As such, the net metering agreement in this case, which was entered into subject to the Net Energy Metering Rider to the West Penn Tariff, and the purportedly improper termination thereof, necessarily involve the reasonableness, adequacy, and/or sufficiency of the service and rates of West Penn, a public utility, with regard to net metering. Moreover, if West Penn has to pay for alternative energy at the full retail rate that a customer-generator receives when it is not actually a customer-generator as that term is defined under the AEPS Act, then other ratepayers or the public utility may have to pay more for electricity.

Thus, this is not a simple statutory interpretation question as the majority posits. Rather, the question here involves the complex interplay of the electric service scheme and the use of alternative forms of energy, as regulated and administered under the Public Utility Code, the Competition Act, and the AEPS Act. Where statutes or parts of statutes "relate to the same persons or things or to the same class of persons or things," they are *in pari materia* and "shall be construed together, if possible, as one statute." 1 Pa. C.S. § 1932(a)-(b). The question of whether a generation facility qualifies as a "customer-generator" entitled to the special compensation provisions of "net-metering" has a significant

RCJ-7

impact on the provision of electric service and is intertwined with the interpretation and application of West Penn's tariff and its provision of services to its other customers. "It is well-settled law that initial jurisdiction over matters involving the reasonableness, adequacy[,] or sufficiency of a public utility's service, facilities[,] or rates is vested in the PUC and not in the courts." Morrow v. Bell Tel. Co., 479 A.2d 548, 550 (Pa. Super. 1984). The PUC also has exclusive jurisdiction over a utility's "formation of reasonable rules and regulations governing the conditions under which service, facilities[,] and rates shall be rendered, constructed[,] or imposed." Id. Therefore, we are required to read the Public Utility Code, the Competition Act, and the AEPS Act *in pari materia* in ascertaining whether the PUC has jurisdiction over the issues in this case.

In arriving at its conclusion, the majority considered only whether the AEPS Act contains an "express" grant of authority, and it did not consider whether such authority may be inferred based on a "strong and necessary implication" from the text as this Court did in ARIPPA, 966 A.2d at 1211. In acknowledging the PUC's jurisdiction and authority under the AEPS Act, we recognized that although "[t]he legislature imbues the [PUC] with authority in enabling statutes [and] [t]he statutory grant of power must be clear[,] [i]f the statute's text does not provide the [PUC] with specific authority, a strong and necessary implication from such text may, nonetheless, provide such authority." Id. As discussed above, the Legislature has *expressly* granted the PUC authority to administer the AEPS Act, including defining the terms at issue here. However, to the extent it did not do so,

there is at the very least a "strong and necessary implication" from the text of such authority.[7]

That the relief requested is framed in terms of damages does not require a different result. In Elkin, the Supreme Court rejected the plaintiff's reliance upon the analysis set forth in Feingold to support his assertion that the PUC does not have jurisdiction in any case involving an action for damages. Elkin, 420 A.2d at 376. The Supreme Court found that this "interpretation [of Feingold] . . . is too broad and would 'virtually strip' the PUC of all jurisdiction merely by framing the allegations in contractual and/or trespassory terminology, and demanding damages." Id. at 375. Instead, the Supreme Court clarified that the issue in Feingold was concerned only with *the adequacy of remedies available under the law*, and resolution of that issue was *not based upon whether the PUC had*

_____

[7] See also Dep't of Envtl. Res. v. Butler Cnty. Mushroom Farm, 454 A.2d 1 (Pa. 1982). The question in that case was whether the Department of Environmental Resources (DER) had the authority to issue administrative compliance orders under the Pennsylvania General Safety Law (Act), Act of May 18, 1937, P.L. 654, as amended, 43 P.S. §§ 25-1-25-15. In considering the issue, the Supreme Court reiterated the well-settled principle that "[t]he powers and authority [to be exercised by administrative agencies] must be either expressly conferred [by the legislature] *or given by necessary implication*." Id. at 4 (emphasis added) (citations omitted). The appellees argued that statutory construction was not necessary because the clear language of the Act did not grant DER the authority to issue such orders, and thus there was no enforcement scheme. Id. at 5. The Supreme Court rejected that argument and stated that such position "ignored the facts that . . . it is inappropriate to determine the power of an administrative agency in a linguistic vacuum . . . and . . . the power of administrative agencies includes such powers as are implied necessarily." Id. at 6. As for appellees' contention that there was no enforcement scheme in the Act, the Supreme Court concluded that such argument was "factually inadequate" and "[t]he mere fact that this aspect of the enforcement scheme was not included in the Act is of no moment since the Act must be read in *pari materia* with the applicable portions of the Administrative Code." Id. at 7 (citing 1 Pa. C.S. § 1932) (subsequent citations omitted). The Supreme Court clarified the issue in the case as one dealing with "the authority of the agency charged with the implementation" of the Act, and stated that the appellees "obviously ignore[d] the well-recognized role of the adjudicative process as an alternative implementing tool." Id.

*jurisdiction*. Id. at 375. Because the majority relied on Feingold without considering the Supreme Court's subsequent clarification of that decision in Elkin, I am not persuaded by that analysis. (Maj. Op. at 10.)

In sum, given that the PUC was specifically tasked with *developing, implementing, and monitoring* the AEPS Act, I would find that "[t]he competence of the [PUC] in the[ ] area[ of alternative energy and net metering, generally,] is substantially greater than the court's, and the need for uniformity of policy is apparent." Elkin, 420 A.2d at 376-77. By holding that the PUC does not have primary exclusive jurisdiction to decide the specific definitional issues in this case, the majority takes a large step backwards with regard to the fundamental concern of promoting consistency and uniformity in the public utility arena and in the area of alternative energy. Id. at 376. Moreover, it is the PUC, not the courts, that was tasked with both restructuring the electric service industry and administering the AEPS Act based upon the PUC's special experience and expertise in such complex areas. See 66 Pa. C.S. § 2804; 73 P.S. §§ 1648.5, 1648.7. It follows that neither consistency nor uniformity is achieved by permitting the courts of common pleas of this Commonwealth to impose differing interpretations of the AEPS Act, the administration of which is specifically committed to a particular administrative agency, the PUC.

For the foregoing reasons, I respectfully dissent and would reverse the order of the trial court and require it to cede jurisdiction over the case to the PUC under the doctrine of primary exclusive jurisdiction.

_____
**RENÉE COHN JUBELIRER,** Judge

Judge Covey joins in this dissenting opinion.

RCJ-10